**Diane DOE, by Robert and Naomi Doe, her parents and next friends, Plaintiffs,**

**v.**

**Omer RENFROW, Superintendent of Highland Town School District, George Kurteff, Principal, Highland Senior High School, Harvey Keim, Principal of Highland Junior High School, John Guiden, Lorraine King, Lawrence Vasser, Burton Masepohl, John Terpstra, members of the Highland Town School District Board, Al Prendergast, Police Chief, Highland, Indiana, Patricia Little, Individual Intervenors, Defendants.**

**No. H 79–233.**

United States District Court,
N. D. Indiana,
Hammond Division.

Aug. 30, 1979.

Myrna Hart, Valparaiso University School of Law, Valparaiso, Ind., David Goldberger, Joseph A. Morris, Chicago, Ill., for plaintiffs.

John P. McQuillan, Gary, Ind., Rhett L. Tauber, Merrillville, Ind., Leon R. Kaminski, Edward L. Volk, LaPorte, Ind., Charles H. Criss, Peru, Ind., David E. Mears, Charles L. Zandstra, Highland, Ind., Jerome H. Torshen, Stephen C. Leckar, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

### I. *Introduction*

This action was initiated in a complaint filed by several named plaintiffs protesting certain procedures conducted by officials of the Highland, Crown Point and Merrillville, Indiana school systems. Those named plaintiffs alleged that search activities conducted by certain school officials assisted by local police officers violated the plaintiffs' rights secured by the Fourth and Fourteenth Amendments to the Constitution. Subsequent to oral argument and upon the granting of a motion to dismiss certain par-

ty plaintiffs, made by plaintiffs' counsel, only Diane Doe and her parents as next friends remain as plaintiffs in this action. After extensive oral argument and presentation of evidence on June 7, 1979, this Court dismissed all but the above captioned defendants. Several hundred parents or patrons of the Highland School System were permitted to intervene as party defendants.

Plaintiff, Diane Doe, seeks to have the actions of the defendant school officials, the police chief of the Highland Police Department and the dog trainer to be declared violative of her constitutional rights guaranteed by the Fourth and Fifth, Ninth and Fourteenth Amendments to the Constitution. The plaintiff further seeks to have the complained of activities of the named defendants permanently enjoined. Plaintiff brings her action pursuant to both sections 1983 and 1985 of Title 42 U.S.C. Also requested by plaintiff is a class certification of all persons who were enrolled at Highland High School and Highland Junior High School who were subject to the complained of activities or those who would be enrolled hereafter as such students in those institutions. Such a class would be certified pursuant to F.R.C.P. 23(b)(2). Presentation of any evidence of possible damages was reserved until this Court's determination on the above issues.

Jurisdiction in this matter for purposes of deciding any and all questions concerning plaintiffs' request for an injunction against the named defendants is pursuant to 28 U.S.C. §§ 1343(3) and 1343(4).

This document shall constitute the Court's findings and conclusions of law as required by F.R.C.P. 52.

## II. *Facts*

At issue in this law suit is the constitutional propriety of an investigation conducted by administrators of the Highland school system assisted by local police officers at the Junior and Senior High Schools in Highland, Indiana.

Highland, Indiana is a community consisting of approximately 30,000 residents located in the northwest corner of the state in Lake County, Indiana. The school community of Highland has, among several elementary schools, a Junior and Senior High School. Both these campuses are located on the same site. The school buildings are adjacent to one another and the approximately 2,780 students of both schools share common facilities located in the buildings.

Although the problem of illicit drug use within the schools was not a novel one in Highland before 1978, it became progressively more acute and more visible within the Senior and Junior High Schools during the 1978 academic year. Beginning in the fall of that year, concern over drug use within the school intensified as school officials recorded instances of drug use by students. From September 1978 to March 22, 1979, twenty-one instances were recorded when students were found in possession of drugs, drug paraphernalia or alcohol, or under the influence of drugs. More alarming to school officials was the fact that of those twenty-one instances, thirteen occurred within a twenty school day span just prior to the complained of activities.[1] Also, during this four week period, school administrators received daily reports from faculty, students and parents concerning the use of drugs within the Junior and Senior High Schools.[2] Out of these general reports, two students were identified as drug users, however, after investigation by school officials, no evidence of any drug use was found concerning the named students.

Throughout the year, and especially during this four week period, school officials, teachers and even members of the student

---

1. The 13 students involved in drug related incidents were withdrawn from the school system. Testimony at trial indicated the students used several types of drugs including alcohol, marijuana, and PCP, an animal tranquilizer.

2. These reports consisted of direct communication between teachers at the Junior and Senior High School and school administrators, either face to face or by signed written notes; by student tips, usually anonymous, by letters from parents, and by telephone calls, also, usually anonymous.

body became concerned about the negative impact the use of drugs within the school was having on the educational environment. Classroom disruptions and the concomitant loss of learning time occurred as a result of disciplining those students found to have been using drugs in the school during the regular school hours. Moreover, there was a feeling, at least by some students including the plaintiff, that peer pressure existed in favor of using drugs while on campus. Not to use drugs was considered not to be "cool" by members of the student body who did use drugs. Because of the increasing use of drugs within the school, students, faculty and administrators suffered a loss of morale at both the Senior and Junior High School.

To combat what was perceived as an increasingly alarming drug problem within the school system, members of the Highland Town School District Board suggested the use of properly trained dogs to search for drugs within the school building. The use of drug detecting canine units was discussed at the March 6, 1979 meeting of the Board of the Highland Community School District and Superintendent of Schools, Omer Renfrow. Renfrow decided to use the trained dogs in a drug investigation and he arranged a second meeting for March 14, 1979. This meeting was attended by school administrators of the Senior and Junior High Schools and by members of the Highland Police Department.[3] Also present at this meeting was Patricia Little, a trainer of drug detecting canines. Little was asked to attend because she had had experience in the field of canine searches in schools.[4]

At this meeting, the school administrators informed the police officers that they intended to conduct an investigation within the school buildings using canine units to detect and remove any narcotics or narcotic paraphernalia. To carry out this procedure, they requested the assistance of the Highland Police Department and of volunteer canine units experienced in drug detection. The objective was to rid the Junior and Senior High Schools of illicit drugs and discourage further drug use on the campuses. The school officials insisted, and the police agreed, that no criminal investigations would occur as a result of any evidence recovered during the school investigation. The school officials did intend, however, to bring any necessary disciplinary actions against students found in possession of contraband.

### A. Activities Inside The School

On March 23, 1979, a school wide drug inspection was conducted by the administrators of the Highland School System with the assistance of the Highland Police Department and volunteer canine units trained in marijuana detection. The inspection occurred in both the Junior and Senior High School campuses and began during the first period class. Teachers were informed of the inspection that morning by means of a sealed note upon their classroom desks. Each classroom teacher was instructed to keep their students in the first period class and to have them perform their customary work. A canine team visited each classroom in both the Junior and Senior High School buildings. Each team consisted of a school administrator or teacher, a dog and its handler and a uniformed police officer. Four such teams were used in the Senior High School building and two were operating in the Junior High School rooms. Students were instructed to sit quietly in their seats with their hands and any purses to be placed upon their desk tops while the dog handler introduced the dog and led it up and down the desk aisles. The

---

3. Persons in attendance were: George Kurteff, Principal of Highland High School; Harvey Kiem, Principal of Highland Junior High School; Merlin Clinkenbeard, Assistant Principal of Highland High School; Al Prendergast, Chief of Police, Highland Police Department; Lt. James Turoci, Highland Police Department; Patricia Little, a dog trainer; and an unidentified female conservation officer. Renfrow was not present.

4. Renfrow requested information from the Highland Police Department concerning the use of trained canine units for the planned investigation. Little was contacted by the police department requesting her to attend the March 14, 1979 meeting.

canine teams spent approximately five minutes in each room. No incidents of disruption occurred in the classrooms because of the presence of the dogs or the teams. The entire investigation lasted approximately two and one-half hours during which time students wishing to use the washrooms were allowed to leave the classroom with an escort of the same sex to the washroom door. The administrative purpose of the escort was to prevent the disposal of any drugs on the way to the washroom. No students were observed while in the washrooms. In order to keep disruptions to a minimum, late arrivals at the school were directed to a room other than their regular first period classroom. Uniformed police officers and school administrators were present in the halls during the entire investigation. Custodians were present near all locked doors to provide immediate exit if necessary. During the inspection, a dog alerted[5] to a particular student on approximately fifty occasions. After each alert, the student was asked to empty his or her pockets or purse. A body search[6] was conducted with respect to eleven students because the dog continued to alert after the student had emptied pockets or purse. Plaintiff Doe was one of those students to which a dog continued to alert after she emptied her pockets. She was quietly escorted to a nurse's station in the Junior High School and was asked to remain in the waiting room. Upon being asked to enter the inner office, two women introduced themselves to the plaintiff. One was a friend of the plaintiff's mother. Plaintiff was asked if she had ever used marijuana to which she answered she had not. She was then asked to remove her clothing. She was permitted to turn her back to the two women while she was disrobing. Upon removal, her clothing was briefly examined, her hair was lifted to determine if any substances were hidden in it, and she was immediately permitted to dress. No marijuana or other drugs were found in plaintiff's possession, although it was later discovered that plaintiff had been playing with one of her dogs that morning of the search and that dog was in heat.

As a result of the investigation seventeen students were found in possession of drugs; twelve of those students withdrew voluntarily from school and three students were expelled pursuant to the due process statutes of the State of Indiana. I.C. 20–8.1–5–5 et seq. Additionally, two students were suspended by the administration because they were found to be in possession of drug paraphernalia.

### B. *The Canine Units*

Ms. Patricia L. Little is the owner and operator of the Edelheim Police K–9 Academy in Bunker Hill, Indiana. The academy trains and certifies dogs and their handlers in the detection of marijuana and explosives as well as in tracking and attack. Little is also a sworn, non-paid and non-uniformed Deputy Sheriff of Miami County, Indiana. All the animals used in the March 23, 1979 inspection were certified and trained by Little at her academy. Upon request of the Highland School officials, Little agreed to provide the necessary trained dog units for the March inspection. She contacted the various dog handlers in regard to their availability for the inspection informing them of the time and place. Each handler participated as an unpaid volunteer with their own dogs.[7]

---

5. An alert is an indication of a trained canine that the odor of the drug, in this case marijuana, is present in the air or upon the individual.

6. Although it was not properly defined at trial, a body search was something less than the nude search that plaintiff complains she was subject to. Body searches involved extensive examination of the student's clothing entailing the removal of some of the garments.

7. Plaintiff emphasizes the occupations of the volunteer dog handlers used in this investigation as being predominantly law enforcement employees. Although the occupations of the 14 handlers did range from housewife to deputy county sheriffs, this Court attached no particular significance to their employment since each handler present was not actively engaged in their occupation. Moreover, each handler, provided their dog at their own expense and was not representing any law enforcement agency while at the schools.

On March 23, 1979 Little met with representative of the Highland Town School District, the Highland Police Department and the dog handlers. Little's main responsibility was to coordinate the efforts of the school officials with the dog handlers. Patricia Little herself did not participate in any capacity other than as a volunteer dog trainer. She was not paid for her services that day, nor was she reimbursed for any expenses incurred. Although she wore a jacket with her academy's patch sewn on the sleeve and an American flag patch attached to the other sleeve, she did not wear the uniform of any law enforcement agency. She was not armed.

During the inspection, Little and each of the other dog handlers involved knew the individual alerts their dogs would give in the presence of any marijuana or marijuana paraphernalia. They also knew the intention by school officials to ask certain students to empty pockets or purses if the dog's alert continued. Little did not suggest that a strip search procedure be implemented nor did she know that a strip search was conducted the day in question until after the inspection. Moreover, the decision to strip search an individual student was solely the responsibility of the school officials. However, Little and the other trainers did advise the school officials, upon their dogs' continued alert, of the necessity of a pocket and/or purse search. Fourteen handlers and their dogs participated during the

inspection. Little and her dog were accompanied by a school official and a Highland Police officer during her portion of the inspection, limited only to the Senior High School. Little did not have any knowledge of, or direct involvement in, the search of plaintiff, Doe.

### III. The Fourth Amendment

This Court is specifically confronted with the following issues: (1) whether the investigative procedure used by the school officials with the assistance of law enforcement officers, for the sole and exclusive purpose of furthering a valid educational goal of eliminating drug use within the school, was a seizure and search under the Fourth Amendment; (2) whether the use of dogs to detect marijuana and marijuana paraphernalia in the classroom was, standing alone, a search under the Fourth Amendment; (3) whether the admitted search of a student's clothing upon the continued alert of a trained drug detecting canine was violative of rights protected by the Fourth Amendment; and (4) whether the nude body search conducted solely upon the basis of a trained drug detecting canine's alert violated the plaintiff's right to be free from unreasonable search and seizure.

Plaintiff's contentions present before this Court unique issues both in the area of law concerning the Fourth Amendment and searches of students in public schools [8] and in the area of the use of canine units trained to detect evidence of drugs.[9] This

---

**8.** Buss, *The Fourth Amendment and Searches of Students in Public Schools*, 59 Iowa L.Rev. 739 (1974); Donoghoe, *Emerging First and Fourth Amendment Rights of the Student*, 1 J.L. and Educ. 449 (1972); Note, *Students and the Fourth Amendment: Myth or Realty?*, 46 U.M. K.C.L.Rev. 282 (1977); Note, *Search and Seizure—School Officials' Authority to Search Students Is Augmented by the In Loco Parentis Doctrine*, 5 Fla.St.U.L.Rev. 526 (1977).

**9.** Notes, *Constitutional Limitations On The Use of Canines to Detect Evidence of Crime*, 44 Fordham L.Rev. 973 (1976); Comments, *United States v. Solis: Have The Government's Supersniffers Come Down With A Case Of Constitutional Nasal Congestion?*, 13 San Diego L.Rev. 410 (1976). For authorities dealing with the problem in the military context see two articles in *The Army Lawyer*: (a) May 1973,

Kingham, "Marijuana Dogs as an Instrument of Search" and (b) April 1973, Lederer and Lederer,: Admissibility of Evidence Found by Marijuana Detection Dogs."

Realizing fully that the military cases are not dispositive of or binding precedent on the issues raised here, the history of the manner in which the Court of Military Appeals has approached the problem is revealing. See *U. S. v. Unrue*, 22 U.S.C.M.A. 466, 47 C.M.R. 556 (1973); *U. S. v. Thomas*, 1 M.J. 397 (C.M.A. 1976) (a three way split on critical issues); *U. S. v. Paulson*, 7 M.J. 43 (April 9, 1979), reversing on other grounds 2 M.J. 326 (A.F.C.M.R. 1976); and *U. S. v. Grosskreutz*, 5 M.J. 344 (C.A.M.1978). The question of dog searches has again been certified by the Court of Military Appeals and remains pending there. See *U. S. v. Middleton*, 3 M.J. 425 (C.M.A.1977).

latter area also has implications in the public school context.

## A. *The General Inspection*

Considering first plaintiff's contention that the investigation of March 23, 1979 constituted a mass detention and deprivation of freedom in violation of the Fourth Amendment, this Court finds the assertion to be without merit. Plaintiff, as well as other students, is subject to the daily routine of class attendance in an educational environment. During an eight hour day, students must move from room to room, attending classes designated by the administration and taught by teachers hired by the school system. Students are made to change this routine every year, if not every semester. Movement from class to class entails intrusions upon the students' freedoms. Times allocated for each class period are determined by the school officials, not the students. Plaintiff must attend the scheduled classes for the times designated. It was not unusual for students to be kept in their classrooms longer than the normal periods.

Such a regulation of a student's movement in no way denies that person any constitutionally guaranteed right. On the morning in question all students were given an opportunity to perform their usual classroom schedule for an extra 1 and ½ periods. Except for the five minute interval when the canine unit entered the room, plaintiff and all other students were exposed only to a longer than normal first period class. Such an extended period had been experienced at other times during convocations and school assemblies.

School officials maintain the discretion and authority for scheduling all student activities each school day. Plaintiff will not be heard to say that because she was made to stay in her classroom an extra 1½ hours, she was denied a constitutionally protected freedom from unreasonable seizure. No evidence was presented at trial that shows plaintiff was in any way discomforted by the mere fact of being made to continue her class work for an extra 95 minutes. Although the students were requested to remain in their first period classes, those wishing to use the washroom facilities were accommodated by an escort to the washroom door. Care was taken by the school officials to provide custodians at each exit in case an emergency arose. Although unknown by the students, those uniformed officers in the halls that morning were under orders not to pursue any students outside the building. Although it can be argued that the spectre of a uniformed officer may chill some vague right to movement within the school, such contention fails in light of the fact that student movement is constantly restricted for other legitimate educational purposes. Moreover, uniformed police officers are, unfortunately, not an uncommon sight in today's public schools. Therefore, this Court finds no seizure of the plaintiff or other students within the Senior and Junior High School prior to any alert by the trained dogs.

Turning next to the search aspect of the Fourth Amendment, the issue becomes whether the activity of the defendants on the morning in question prior to any alert by the trained dogs was a search and, if so, whether the search, although warrantless, was reasonable. This Court finds for the reasons stated below that entry by the school officials into each classroom for five minutes was not a search contemplated by the Fourth Amendment but, rather, was a justified action taken in accordance with the *in loco parentis* doctrine. Furthermore, the presence of the uniformed police officer in the room, at the request of the school official and with the agreement that no arrests would occur as a result of finding any drugs upon students, did not alter the basic function of the school official's activities. Moreover, the presence of the dog and its trainer within the classroom, also at the request and supervision of the school officials, was only an aide to that official's observation of students. Finally, for purposes of this section, the sniffing of a trained narcotic detecting canine is not a search. Since no search was performed up until the time the dogs alerted, no warrant was necessary for the initial observation by the school officials.

There is no question as to the right and, indeed, the duty of school officials to maintain an educationally sound environment within the school.[10] It is the responsibility of the school corporation personnel to supervise students while they attend classes.[11] It is also the responsibility of the school administrator to insure the proper functioning of the educational process. *M. v. Bd. of Ed. Ball-Chatham C.U.S.D. No. 5*, 429 F.Supp. 288 (S.D.Ill.1977). Maintaining an educationally productive atmosphere within the school rests upon the school administrator certain heavy responsibilities. One of these is that of providing an environment free from activities harmful to the educational function and to the individual students. Drug use within the school became an activity the school administrator wished to eliminate. It cannot be denied that each of the school administrators possessed the authority to enter a classroom on the day in question in order to prevent the use of illicit drugs. *People v. Overton*, 20 N.Y.2d 360, 283 N.Y.S.2d 22, 229 N.E.2d 596 (1967); *M. v. Bd., supra; Bellnier v. Lund*, 438 F.Supp. 47 (N.D.N.Y.1977). Acting alone, each school administrator could have unquestionably surveyed a classroom to prevent drug use. Because those administrators now acted with assistance from a uniformed officer does not change their function. The officers were merely aiding in the inspection, at the request of the school administrators. Their presence does not change the actions of the school official from that of supervision *in loco parentis* to that of an unwarranted search. Although they were obviously clothed with their state authority, they had previously agreed that no arrests would be made as a result of any drugs found that morning. No police investigations took place on that day nor have any arrests or prosecutions been initiated as a result of the March 23, 1979 inspection.

B. *The Dogs Within The Classroom*

■ Nor does this court believe the presence of the dog unit within the classroom changes the nature of the observation.

Again, the trainer and dog were in the rooms at the request and with the permission of the school administrators. The dog acted merely as an aide to the school administrator in detecting the scent of marijuana. The dog handler interpreted the actions of the dog for the benefit of the school administrator. Bringing these nonschool personnel into the classroom to aid the school administrators in their observation for drug abuse is, of itself, not a search. Students are exposed to various intrusions into their classroom environment. The presence of the canine team for several minutes was a minimal intrusion at best and not so serious as to invoke the protections of the Fourth Amendment.

■ Plaintiff, however, contends that the walking up the aisles and the sniffing of the dog constituted a search within the meaning of the Fourth Amendment and, as such, it was not based upon probable cause and was therefore in violation of her constitutionally protected rights. Plaintiff's assertion misreads the present state of the law concerning the use of drug detecting canines.

The use of the dogs in this case occurred in the public school environment, an area where courts have not granted full application of the Fourth Amendment's protections. *Moore v. Student Affairs Committee of Troy State Univ.*, 284 F.Supp. 725 (M.D. Ala.1968); *M. v. Bd. Ball-Chatham C.U.S.D. No. 5*, 429 F.Supp. 288 (S.D.Ill.1977); *Bellnier v. Lund*, 438 F.Supp. 47 (N.D.N.Y.1977). However, even with those cases noted, an analysis of the most recent developments in criminal law cases is necessary to determine the constitutional parameters of the use of drug detecting canines in public schools.

Although the subject of using drug detecting canines has not been specifically addressed in this circuit, it has been analyzed in other courts. In *United States v. Fulero*, 162 U.S.App.D.C. 206, 498 F.2d 748 (1974), a marijuana-sniffing dog was allowed to sniff the air around a footlocker in a bus depot. The defendant alleged such

---

**10.** Ind.Code, § 20–8.1–5–2.

**11.** Ind.Code, § 20–8.1–5–1.

sniffing constituted an unpermissible action in violation of his Fourth Amendment rights. The Circuit Court for the District of Columbia responded that defendant's contention was "frivolous" and that the actions of the police were responsible and not in violation of any constitutionally protected rights. The Second Circuit Court of Appeals held in *United States v. Bronstein*, 521 F.2d 459 (2d Cir. 1975), *cert. den.*, 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976), that the sniffing of a canine at a baggage terminal did not constitute a search. One year later, the Ninth Circuit Court of Appeals also held that the use of marijuana-sniffing dogs to sniff the air around a parked semi-trailer was reasonable and therefore not a prohibited search under the Fourth Amendment. *United States v. Solis*, 536 F.2d 880 (9th Cir. 1976). In *Solis*, the Court of Appeals reversed the district court's holding that use of the dog was a search without probable cause and therefore illegal. The latest circuit to find that the dog's actions of sniffing the air outside a defendant's locker was not a search was in *United States v. Venema*, 563 F.2d 1003, (10th Cir. 1977). See also, *United States v. Race*, 529 F.2d 12 (1st Cir. 1976).

A common thread that runs through all four of the above cited circuit cases was the fact that the law enforcement officers had previous independent information or "tips" concerning the whereabouts of the drugs that were later sniffed out by the dogs. See *Fulero, supra*, 162 U.S.App.D.C. at 206, 498 F.2d at 748; *Bronstein, supra*, at 460; *Solis, supra*, at 881; *Venema, supra*, at 1004, 1005.

▮ Turning to this case, the evidence shows the school administrators had compiled an extensive list of previous incidents of drug use within the school. In twenty school days before the investigation, thirteen incidents were reported where students were found either to be in possession of drugs or drug paraphernalia or under the influence of drugs or alcohol. The atmo-

sphere within the Highland Junior and Senior High Schools was one of frustration on the part of school administrators and faculty brought about by their inability to control or arrest the drug use problem. Additionally, there was evidence from some students of refusal to speak out against those students using drugs for fear of reprisals. The use of the canine units was decided upon only after the upsurge in drug use at the schools. The school officials, therefore, had outside independent evidence indicating drug abuse within the school. Use of the dogs to detect where those drugs were located was not unreasonable under the circumstances. Nor does the fact that the officials had no information about specific students and drug possession invalidate the use of the dogs. This Court now finds that in a public school setting, school officials clothed with the responsibilities of caring for the health and welfare of the entire student population, may rely on such general information to justify the use of the canines to detect narcotics. What level of information is necessary must be determined on a case by case basis, however, this Court holds the lesser standard of a "reasonable cause to believe" applicable in such a determination. See, *M. v. Bd., supra*. School officials fulfilling their state empowered duties will not be held to the same standards as law enforcement officials when determining if the use of canines is necessary to detect drugs within the schools. This lesser standard applies only when the purpose of the dog's use is to fulfill the school's duty to provide a safe, ordered and healthy educational environment.

Also considered as a factor in the above cited dog-sniffing cases was the absence of any normal or justifiable expectation of privacy with respect to the objects searched.[12] See *Bronstein, supra*, at 464 (Mansfield, J. concurring). Although each of those cases dealt with the search of objects rather than of persons, as in this case, the same test of reasonableness applies. As

---

12. *United States v. Fulero* (footlocker); *United States v. Bronstein* (suitcase); *United States v.* *Solis* (semi-trailer); *United States v. Venema* (rented locker).

the Supreme Court of the United States stated in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Fourth Amendment protections are the protections of people not places. The *Katz* Court held that police action which intrudes upon and invades an individual's justifiable expectation of privacy constitutes a search within the meaning of the Fourth Amendment. This Court first distinguishes *Katz* from this case on the basis that this is not a police action and second, that the students did not have a justifiable expectation of privacy that would preclude a school administrator from sniffing the air around the desks with the aid of a trained drug detecting canine. The use of the dog in this operation was an aid to the school administrator and as such its use is not considered a search. *Solis, supra.* Moreover, plaintiff as well as other students in a public school, does not fall within the meaning of *Katz* because of the very nature of public school education. Any expectation of privacy necessarily diminishes in light of a student's constant supervision while in school. Because of the constant interaction among students, faculty and school administrators, a public school student cannot be said to enjoy any absolute expectation of privacy while in the classroom setting.

This is not to indicate that one attending public schools sheds his or her constitutional rights upon entering the school house doors; such is obviously not the case. *Tinker v. Des Moines School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (First Amendment protection when wearing black armbands as a form of student expression); *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (Procedural due process guaranteed in suspension and expulsion hearings). However, in matters concerning the reasonable exercise of supervision and authority by school officials, this Court recognizes that a certain balancing occurs between an individual student's rights and the school administrator's need to protect all students and the educational process. *Bellnier v. Lund,* 438 F.Supp. 47 (N.D.N.Y. 1977). A reasonable right to inspection is necessary to the school's performance of its duty to provide an educational environment. *Moore v. Student Affairs Committee of Troy State Univ.,* 284 F.Supp. 725 (M.D. Ala.1968).

The health and safety of all students at the two schools was threatened by an increase in drug use. The schools' administrators delegated by the state with the duty and responsibility to maintain order, discipline, safety and education within the school system supervised the investigation which was designed with the single purpose of eliminating drug use inside the school buildings. The operation was carried out in an unintrusive manner in each classroom.

Moreover, the procedure of bringing the trained dogs into each classroom was planned so as to cause only a few minutes interruption. All students were treated similarly up until an alert by one of the dogs. No student was treated with any malice nor was the operation planned in a way so as to embarrass any particular student. Weighing the minimal intrusion against the school's need to rid itself of the drug problem, the actions of the school officials leading up to an alert by one of the dogs was reasonable and not a search for purposes of the Fourth Amendment. Up until the trained dogs indicated the presence of marijuana, no violation of any basic Fourth Amendment rights occurred.

#### C. The Pocket Search

When a dog alerted to the plaintiff, she was ordered by a police officer to empty her pockets onto the desk under the supervision of a school administrator. She contends that this violated her constitutional right to be secure against unreasonable search and seizure.

■ The Fourth Amendment recognizes that for each individual there is a sphere of privacy which that individual can justifiedly expect government officials not to invade. In other words, an invasion of that sphere of privacy is a search under the terms of the Fourth Amendment. And, generally, the Fourth Amendment makes two demands of a government official wishing to carry out a search. First, the government

official must have probable cause to believe that the law has been or is being violated. Second, the government official must obtain a warrant before carrying out the search.

But these specific requirements can be modified by special circumstances. A city's interest in enforcing a housing code modifies the probable cause requirement. *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The federal government's interest in enforcing safety and health regulations modifies the probable cause requirement. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). Exigent circumstances can excuse the warrant requirement. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Border searches are subject to a modified probable cause requirement and are excepted from the warrant requirement. *U. S. v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). And searches to prevent skyjacking are subject to a modified probable cause requirement and are excepted from the warrant requirement. *United States v. Skipwith*, 482 F.2d 1272 (5th Cir. 1973).

■ While a school student does not shed at the schoolhouse door rights guaranteed by either the Fourth Amendment or any other constitutional provision (*Tinker v. Des Moines School District, supra*), the student's Fourth Amendment and other constitutional rights are modified by that limited *in loco parentis* relationship which the school officials have with the students. That limited *in loco parentis* relationship modifies the student's Fourth Amendment guarantee of a sphere of privacy which the student can justifiedly expect state officials not to invade. While there is a core of privacy so vital to the student's personhood that it must be respected by a school official standing *in loco parentis*, that sphere of privacy protected by the Fourth Amendment can usually be invaded by a school official standing *in loco parentis* without a warrant, and (rather than upon probable cause) upon reasonable cause to believe that the student has violated or is violating school policy. *Moore v. Student Affairs Committee of Troy State University, supra; M. v. Board of Education Ball-Chatham Comm. Unit School Dist. No. 5, supra*. In other words while "the *in loco parentis* authority of a school official cannot transcend constitutional rights . . ., the student-teacher relationship out of which [*in loco parentis*] authority readily flows does have an impact on the application of constitutional doctrine to the rights of students." *Picha v. Wielgos*, 410 F.Supp. 1214, 1218–19 (N.D.Ill.1976). "The student's right to be free from unreasonable search and seizure must be balanced with the necessity for the school officials to be able to maintain order and discipline in their schools and to fulfill their duties under the *in loco parentis* doctrine to protect the health and welfare of their students." *M. v. Board of Education Ball-Chatham Comm. Unit School Dist. No. 5, supra*, 429 F.Supp. at 292.[13]

13. This Court notes the state of the law is unclear as to whether the Fourth Amendment and its coordinate remedy, the Exclusionary Rule, apply in full force to searches of students. The competing theories seem to be the following: 1) that the Fourth Amendment applies full force, requiring a finding of probable cause before an impartial magistrate before the search could be declared reasonable. *State v. Mora*, 307 So.2d 317 (La.1975); Buss, *The Fourth Amendment and Searches of Students in Public Schools*, 59 Iowa L.Rev. 739 (1974); 2) the Fourth Amendment does not apply because of the doctrine *in loco parentis* which clothed the school officials with immunity as a "private citizen." *Commonwealth v. Dingfelt*, 227 Pa.Super. 380, 323 A.2d 145 (1974); *Mercer v. State*, 450 S.W.2d 715 (Tex.Civ.App.1970); *In re Donaldson*, 269 Cal.App.2d 509, 75 Cal. Rptr. 220 (1969); *People v. Stewart*, 63 Misc.2d 601, 313 N.Y.S.2d 253 (Crim.Ct., N.Y.Co.1970); 3) the Fourth Amendment, although applicable, is emasculated by the inapplicability of the Exclusionary Rule. *United States v. Coles*, 302 F.Supp. 99 (D.Me.N.D.1969); and 4) the Fourth Amendment is applicable but the standard of determining whether the search was reasonable will be lowered to something other than probable cause. *People v. Scott D.*, 34 N.Y.2d 483, 315 N.E.2d 466, 358 N.Y.S.2d 403 (1974); *State v. McKinnon*, 88 Wash.2d 75, 558 P.2d 781 (1977); *People v. Jackson*, 65 Misc.2d 909, 319 N.Y.S.2d 731 (App.Term, 1st Dept.1971), aff'd, 30 N.Y.2d 734, 333 N.Y.S.2d 167, 284 N.E.2d 153 (1972).

In conducting the pocket search, as well as the other searches in question, the school officials clearly were not concerned with the discovery of evidence to be used in criminal prosecutions, but rather were concerned solely with the elimination of drug trafficking within the schools. It cannot be disputed that the school's interest in maintaining the safety, health and education of its students justified its grappling with the grave, even lethal, threat of drug abuse. The pocket search was conducted in furtherance of the school's legitimate interest in eliminating drug trafficking within the school.

It should be noted at this point that had the role of the police been different, this court's reasoning and conclusion may well have been different. If the search had been conducted for the purpose of discovering evidence to be used in a criminal prosecution, the school may well have had to satisfy a standard of probable cause rather than reasonable cause to believe. *Picha v. Wielgos, supra.* Furthermore, this court is not here ruling whether any evidence obtained in the search could have been used in a criminal prosecution. This court is ruling that so long as a school is pursuing those legitimate interests which are the source of its *in loco parentis* status, "maintaining the order, discipline, safety, supervision, and education of the students within the school" (*Picha v. Wielgos, supra,* 410 F.Supp. at 1221), it is the general rule that the Fourth Amendment allows a warrantless intrusion into the student's sphere of privacy, if and only if the school has reasonable cause to believe that the student has violated or is violating school policies.

■ The pocket search was an invasion of the sphere of privacy which the Fourth Amendment protects; it was a search. But the alert of the dog constituted reasonable cause to believe that the plaintiff was concealing narcotics. Having that requisite reasonable cause to believe that the plaintiff was concealing narcotics, the defendants did not violate the plaintiff's Fourth Amendment rights by ordering her to empty her pockets onto the desk. By conducting the pocket search, the school officials did not violate the plaintiff's right to be secure against *unreasonable* search and seizure.

## D. *The Nude Search*

■ Plaintiff further alleges that being subjected to the nude search that morning violated her right against unreasonable search and seizure. It was only upon a continued alert of the trained canine that the school officials based their decision to search the plaintiff. This Court must focus upon the reasonableness of the search to determine its constitutionality. Upon doing so, this Court holds that conducting a nude search of a student solely upon the continued alert of a trained drug-detecting canine is unreasonable even under the lesser "reasonable cause to believe" standard.

Subjecting a student to a nude search is more than just the mild inconvenience of a pocket search, rather, it is an intrusion into an individual's basic justifiable expectation of privacy. Before such a search can be performed, the school administrators must articulate some facts that provide a reasonable cause to believe the student possesses the contraband sought. The continued alert by the trained canine alone is insufficient to justify such a search because the animal reacts only to the scent or odor of the marijuana plant, not the substance itself. There is always the possibility that one's clothing may have been inadvertently exposed to the pungent odor of the drug. Although a trained dog is certainly more discriminative than electronic detection devices, *United States v. Bronstein, supra,* at 462, 463, it only alerts to the odor of the substance, not the substance itself. Therefore, the alert of the dog alone does not provide the necessary reasonable cause to believe the student actually *possesses* the drug.

■ Factors considered important when determining the reasonableness of a student search are: (1) the student's age; (2) the

student's history and record in school; (3) the seriousness and prevalence of the problem to which the search is directed; and (4) the exigency requiring an immediate warrantless search. *Bellnier v. Lund*, 438 F.Supp. 47 (N.D.N.Y.1977); *People v. Scott D., supra*, fn. 11.

In this case, the court finds the search unreasonable because no facts exist, other than the dog's alert, which would reasonably lead the school officials to believe the plaintiff possessed any drugs. Therefore, the nude search of plaintiff was unlawful because it did violate her Fourth Amendment right against an unreasonable search and seizure.

### E. *Conclusion*

It has long been established that law enforcement personnel can and must use the basic human senses in the detection of crime. These human senses may generally be aided by such non-living artificial devices as binoculars, flashlights, magnetometers, breathalyzers, camera lenses and ordinary prescription glasses. Four decades ago, Professor Wigmore cited the rule that most courts held admissible evidence that tracing by a trained dog led to the accused. 1 Wigmore, Evidence, Section 177(2) (3d Ed. 1940).

Dogs have long been used in police work. They often accompany police officers on night patrol in detection through sound and scent of would-be criminals lurking in the dark or moving in stealth. It is well known that a patrol dog is endowed by nature with qualities of hearing and smell that appear to be superior to those of humans. See *U. S. v. Thomas*, 1 M.J. at 401 (C.M.A.1976).

It is generally known that marijuana radiates a distinctive odor which can be detected by humans acquainted with it, and by trained dogs. *U. S. v. Guerra*, 554 F.2d 987 (9th Cir. 1977); *U. S. v. Bronstein*, 521 F.2d 459 (2d Cir. 1975), *cert. den.*, 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324; *U. S. v. Pond*, 523 F.2d 210 (2d Cir. 1975), *cert. den.*, 423 U.S. 1058, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976); *U. S. v. Martinez-Miramontes*, 494 F.2d 808 (9th Cir. 1974), *cert. den.*, 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974); *U.*

*S. v. Falley*, 489 F.2d 33 (2d Cir. 1973); *U. S. v. Lewis*, 392 F.2d 377 (2d Cir. 1968), *cert. den.*, 393 U.S. 891, 89 S.Ct. 212, 21 L.Ed.2d 170 (1968); and *People v. Campbell*, 67 Ill.2d 308, 10 Ill.Dec. 340, 367 N.E.2d 949 (1977).

People trafficking in illegal narcotics often attempt to conceal the odor. See *U. S. v. Fulero*, 162 U.S.App.D.C. 206, 498 F.2d 748 (1974). The existence of such odors often provides useful information to investigative law enforcement officers concerning the location and proximity of illegal controlled substances. The Supreme Court of the United States has long recognized that such odors can be convincing evidence of probable cause. See *Johnson v. U. S.*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1947). (It should be noted this case went off on the warrant requirement and not the existence of probable cause.)

The Supreme Court of the United States has yet to rule explicitly on whether the use of narcotic detection dogs in the context of the Fourth Amendment establishes probable cause. One case may point the direction. In *U. S. v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), a marijuana detection dog signaled the presence of a controlled substance (marijuana) inside a footlocker. The First Circuit had held that such provided probable cause to believe that the footlocker contained a controlled substance. Here, as in *Johnson*, the court went off on the warrant requirement of the Fourth Amendment. It was the unauthorized and nonconsensual opening of the locker and the inspection of its interior that constituted the unlawful search, not the use of the dog. The dog's conduct constituted evidence that caused the court to observe that "Even on the record the issuance of a warrant by a judicial officer was reasonably predictable.", 97 S.Ct. 2486. Obviously, under the reasoning of *Johnson* and *Chadwick* a description of a dog's conduct, training and experience by a knowledgeable person who can interpret the conduct of the dog as signaling the presence of a controlled substance would constitute the minimal requirement for finding probable cause.

It is also apparent that the use of properly trained dogs in public areas accessible to them is a useful aid to law enforcement officials in determining the existence of probable cause to believe that contraband exists within a certain locale. In *U. S. v. Solis*, the 9th Circuit at 536 F.2d 882 stated:

"Dogs because of their keen olfactory sense, have long been used to assist police in search and rescue missions . . . . Detection of contraband is a similar and related task. The recent proliferation of crimes involving transportation of drugs and explosives has led naturally to the training of dogs . . . to detect the presence of such contraband."

Neither does the reasoning or result in *Katz v. U. S.*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1976), constitute a per se limitation on the proper use of properly trained dogs in the limited and legitimate area of police investigation. Neither does the same constitute a *per se* violation of the Fourth Amendment. In a proper case, the conduct of a properly trained dog standing alone can provide the necessary basis for probable cause. To be sure such conduct of a dog must be interpreted by a knowledgeable person. See the careful analysis in *U. S. v. Grosskreutz*, 5 M.J. 344 (C.M.A.1978).

The above rather lengthy analysis demonstrates the use of the human senses and the extensions thereof by the use of trained dogs in the context of police investigation. There is a heavy if not total carryover of the ideas expressed to administration of the public schools.

The General School Powers Act of the State of Indiana, I.C. 20–5–1–1 is a broad grant of authority to those legally responsible for the administration of the public schools and has been so interpreted by the Courts of Indiana. *Salem Community School Corp. v. Easterly*, 150 Ind.App. 11, 275 N.E.2d 317 (1971), and *Gary Teachers Union No. 4 v. Gary*, 152 Ind.App. 591, 284 N.E.2d 108 (1972). See also, *Bouse v. Hipes*, 319 F.Supp. 515 (S.D.Ind.1970).

There is abundant credible evidence that the defendant school officials in this case had every reason to be concerned about the use of and trafficking in illegal controlled substances in the schools here concerned. It is equally apparent that in the fulfillment of their statutorily imposed duties these school officials could and should use their human senses to detect conditions that were violative of the good order of the school. In doing so, such school officials are not acting as police officers but are simply meeting their obligations as school officials.

These school officials can secure proper aids to supplement and assist basic human senses. In doing so, it should be emphasized that the defendants proceed as *school officials* and not, per se, as policemen. In this case, acting as school officials, the defendants proceeded with a careful and sensitive plan that was formulated with much concern for basic educational values. In the execution of this plan, the school officials sought the aid of other trained persons who had relevant talents from various community resources. Various police departments were one such resource. Ms. Little with her vast experience in the training of dogs was another resource. Ms. Little was engaged in a perfectly legitimate, if unprofitable, enterprise of training these type dogs. There is nothing sinister about her enterprise. As this Court saw and heard her in the court room, there is absolutely nothing sinister about her.

The school officials made every reasonable effort to carry off this plan in a manner compatible with proper order in the schools and with the values therein involved. The proper administration of the public schools necessarily involves the requirement that students be in certain places at certain times. So it was with this plan. Necessary flexibility was built into it in regard to washroom and other human needs. Respect for individual dignity of the student was carefully maintained. A light relaxed atmosphere was created. The effect was anything but a gestapo-like effort run by gestapo-type people. To suggest anything approaching that idea is to do an extreme disservice to a group of dedicated people who carry heavy legal and moral obligations for public education.

■ This Court finds no constitutional fault with the basic plan and program as executed. It finds no fault with the school administrators using their own senses and the senses of properly trained outside personnel and dogs to detect serious conditions that are patently adverse to the proper administration of a public school. No fault is found with requiring students to remain in their seats without notice and with their hands on their desks for short periods of time. No fault is found with requiring a student to empty clothing pockets and/or purses upon the alert of a properly trained dog conducted by a properly trained person.

However, when the dog has alerted as to a particular student in the above context and that student is removed from the basic routine as above described and taken to another area of the school for a more thorough examination of the student's body and clothing, another set of constitutional values comes into play. In such a case, there must be adherence to the protections required by the Fourth Amendment. Of course, this requirement while basic and fundamental depends on the test of reasonableness. This Court cannot say as a matter of law that the alerting of a trained dog standing alone is sufficient to establish reasonable cause to believe a complete body search by *school* officials in surroundings that insure and maintain human dignity. This Court can conceive of many situations where the alert of a trained dog alone can provide the necessary reasonable cause for a more complete but private body search.

It is this Court's finding that no such Fourth Amendment probable cause can be found in this record as to the body search of the only individual plaintiff remaining in this case. To be sure, the question may be close when the situation is frozen as of the time the search took place. However, this Court has serious reservations as to whether there were sufficient facts to justify a full body search of this plaintiff at the time it was conducted.

IV. *Defendants Pendergast and Little*

■ This Court now grants summary judgment in favor of both defendant Al Pendergast, Chief of Highland Police Department, and Patricia Little.

Pendergast did not participate in the illegal search of plaintiff Doe, nor does any evidence show he conducted the search. No liability can be found for any of the actions of this defendant. *Adams v. Pate*, 445 F.2d 105 (7th Cir. 1971).

Patricia Little, likewise, did not participate in the illegal search, moreover, she in no way indicated to the school officials that such illegal searches were necessary at the Highland Schools. This Court does not, therefore, find the actions of Little during the morning in question to have violated any of plaintiff's constitutional rights. See *Baker v. McCollan*, —— U.S. ——, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

V. *Relief*

The plaintiff has prayed for two forms of relief in the present action and has reserved on the prayer for damages. This Court now rules on all three forms of relief, declaratory judgment, injunction, and damages. Because of the Court's findings on the immunity of the defendant school officials, the issue of damages can be determined at this time.

A. *Damages*

■ It is settled case law that school officials possess a qualified immunity with respect to acts performed within the course of their duties. *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), *reh. den.*, 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975); Note, *School and School Officials*, 78 W.Va.L.Rev. 259 (1975). That immunity exists if the official acts in good faith and not in ignorance or disregard of settled indisputable principles of law. *Wood v. Strickland, supra*, 420 U.S. at 321, 95 S.Ct. 992. In the *Wood* case the court stated:

"We think there must be a degree of immunity if the work of the schools is to go forward; and, however worded, the immunity must be such that public school officials understand that action taken in good-faith fulfillment of their responsibilities and within the bounds of reason

under all the circumstances will not be punished and that they need not exercise their discretion with undue timidity." *Wood v. Strickland, supra,* at 321, 95 S.Ct. at 1000.

■ The defendant school administrators acted in good faith and with a regard for the welfare and health of the plaintiff. Her search was conducted in an atmosphere designed to reduce to a minimum any apprehension or embarrassment. Moreover, the law in the area of student searches in public schools is obviously unsettled as suggested by the diversity of the theories and results in the cases cited here. This Court will not charge school officials with "predicting the future course of constitutional law." *Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 188 (1966). Therefore, this Court finds that the defendant school officials are immune from liability arising out of the search and are entitled to summary judgment on the issue of monetary damages.

### B. *Declaratory Relief*

Plaintiff is entitled to declaratory relief only upon the Court's finding that the nude body search made without a finding of any reasonable cause to believe is in violation of her Fourth Amendment rights. In all other aspects, plaintiff's prayer for declaratory relief is now DENIED. See, 28 U.S.C. § 2251.

### C. *Injunctive Relief*

■ This Court now DENIES plaintiff's motion for a permanent injunction as to all issues raised. Because this Court has ruled that the nude body search of plaintiff was in violation of the Fourth Amendment and thus unlawful, the request now becomes similar to a prayer for injunctive relief against a criminal act and therefore unnecessary. *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). Moreover, granting plaintiff's prayer for injunctive relief as to the other aspects of the inspection complained of would be inconsistent with this Court's findings.

### VI. *Class*

This Court now denies plaintiff's request for certification of a class pursuant to 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

There is a basic burden on the plaintiff to show entitlement to a class certification under Rule 23. It takes more than mere verbiage in a complaint to meet that burden. There is also a basic burden to demonstrate that the plaintiff will be an adequate representative of the other members of a class. See *East Texas Motor Freight System v. Rodriquez,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). See also, *Shelton v. Pargo, Inc.,* 582 F.2d 1298 (4th Cir. 1978); *Doninger v. Pacific Northwest Bell, Inc.,* 564 F.2d 1304 (9th Cir. 1977); *Shipp v. Memphis Area Office Tenn. Dept. of Emp. Security,* 581 F.2d 1167 (6th Cir. 1978); and *Miller v. Motorola, Inc.,* 76 F.R.D. 516 (N.D. Ill.1977).

■ The record here clearly discloses several fatal failures of the plaintiff to meet the elementary requirements of Rule 23. Those members of the proposed class are not so numerous so as to make joinder of them as parties impracticable. Fifty students were alerted to by the drug detecting canines on the morning in question. Of those fifty, eleven were subject to a more extensive search of the body. Of those eleven, only three other students were subject to the unlawful nude search. It is also very clear from the record that some students in this high school are not in sympathy with the claims and contentions of this plaintiff. This Court finds that joinder would have been permissible and that in light of counsel's motion to dismiss party plaintiffs it now DENIES plaintiff's motion for class certification.