Diane DOE, etc., et al.,
Plaintiffs-Appellants,

v.

Omer RENFROW, etc., et al.,
Defendants-Appellees.

No. 79–2116.

United States Court of Appeals,
Seventh Circuit.

Argued April 3, 1980.

Decided July 18, 1980 *.

Rehearing Denied Appellees Aug. 1, 1980.

Rehearing and Rehearing En Banc
Denied Appellants Nov. 3, 1980.

See 635 F.2d 582.

Joseph A. Morris, Chicago, Ill., for plaintiffs-appellants.

Rhett L. Tauber, Merrillville, Ind., for defendants-appellees.

Before CUMMINGS, SPRECHER and BAUER, Circuit Judges.

PER CURIAM.

In May 1979, plaintiff Diane Doe, a student at Highland Junior High School in Highland, Indiana, and four other students[1] filed a civil rights complaint under 28 U.S.C. §§ 1343(3) and 1343(4). The defendants were Omer Renfrow, Superintendent of the Highland, Indiana, Town School District; George Kurteff, Principal of the Highland Junior High School; five members of the Highland Town School District Court; Al Prendergast, Highland Police Chief; and Patricia Little, a trainer of drug-detecting canines.[2] Plaintiff requested a class certification of other students at Highland High School and Highland Junior High School. The gravamen of the complaint was that plaintiff and others were illegally sniffed by police dogs during school hours and pocket-searched if a dog alerted

---

* This appeal originally was decided by unreported order on July 18, 1980. See Circuit Rule 35. The panel has decided to issue the decision as an opinion.

1. The four other plaintiff students were dismissed without prejudice to become members of the proposed plaintiff class (but with prejudice with respect to damages) by the district

judge on motion of plaintiff's counsel on June 7, 1979.

2. Fourteen other named defendants were dismissed without prejudice by the district court on June 7, 1979. Several hundred parents or patrons of the Highland School District were simultaneously permitted to intervene as party-defendants.

to them in order to determine whether they possessed controlled substances and contraband. As part of the drug investigation, plaintiff alleged that she and three other students "were compelled to remove their clothing and submit to visual inspection by defendants' agents" (Par. 17 of complaint).

The complaint also charged that 2,780 students at Highland High School were subject to the canine sniffing and that 17 of them thereafter "were summarily suspended, expelled, or compelled to withdraw from attendance at school" (Par. 16). According to plaintiff, defendants' practice was "unsupported by particularized facts, reasonable suspicion or probable cause to believe that any of the persons" subject to the canine drug investigation would possess controlled substances (Par. 28). Alleging that defendants' acts violated the Fourth and Fourteenth Amendments in particular, Diane Doe sought $50,000 in actual damages and an equal amount in punitive damages, as well as declaratory and injunctive relief.

A hearing was held on June 7, 1979, with respect to various motions of the parties. On August 30, 1979, Judge Sharp dismissed the action on the merits as to the Highland police chief and dog trainer Patricia Little because they did not participate in the strip search. He granted defendant school officials summary judgment on the issue of monetary damages for the body search of Diane Doe.[3] However, he held that she was entitled to declaratory relief upon the court's finding that the nude body search was made without a finding of reasonable cause and in violation of her Fourth Amendment rights. The judgment denied all other aspects of her prayer for declaratory relief, denied her motion for a permanent injunction and denied class certification. The judgment was supported by a lengthy, thoughtful opinion reported in 475 F.Supp. 1012.[4]

Defendants have not appealed from the trial court's ruling that the nude search of Diane Doe was without reasonable cause to believe she possessed contraband. Because this ruling was not appealed, we will not consider the argument contained in Part V of the brief of *amicus curiae* Indiana School Boards Association.

For the reasons given in Judge Sharp's scholarly opinion, which we adopt as our own, the judgment is affirmed except with respect to the portion of the decision that the defendant school officials are immune from liability arising out of the nude search because they had a "good faith" defense as articulated in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214. The *Wood* case found that school officials who act "in good-faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances" and "not in ignorance or disregard of settled indisputable principles of law" are immune from liability. The district court in the instant case added that it "will not charge school officials with 'predicting the future course of constitutional law.'" 475 F.Supp. at 1028. No one can quarrel with these propositions but we do take exception to the application of these sterling principles to the facts of this case.

It does not require a constitutional scholar to conclude that a nude search of a

---

**3.** The only defendants who decided upon the nude search of Diane Doe were school officials who possess a qualified immunity. They were held not liable for damages because no malice was shown and their subjective and objective good faith was not challenged by the complaint nor was the law in the area supposedly settled in plaintiff's favor. *Wood v. Strickland*, 420 U.S. 308, 321-322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214, *Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288.

**4.** The result reached by the district court is seemingly condoned in an unnamed student's article entitled "The Constitutionality of Canine Searches in the Classroom," 71 *The Journal of Criminal Law & Criminology* 39 (1980), although the author disagrees with some of the reasoning in the opinion.

See also *United States v. Klein*, 626 F.2d 22 (7th Cir. 1980), Part II of op. dealing with canine sniffing of luggage (at 26–27) and *People v. Lester*, 101 Cal.App.3d 613 (1980), certiorari denied *sub nom. Lester v. California*, —— U.S. ——, 101 S.Ct. 316, —— L.Ed.2d —— (1980).

thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human decency. Apart from any constitutional readings and rulings, simple common sense would indicate that the conduct of the school officials in permitting such a nude search was not only unlawful but outrageous under "settled indisputable principles of law" (420 U.S. at 321, 95 S.Ct. at 1000).

*Wood v. Strickland, supra*, accords immunity to school officials who act in good faith *and within the bounds of reason*. We suggest as strongly as possible that the conduct herein described exceeded the "bounds of reason" by two and a half country miles. It is not enough for us to declare that the little girl involved was indeed deprived of her constitutional and basic human rights. We must also permit her to seek damages from those who caused this humiliation and did indeed act as though students "shed at the schoolhouse door rights guaranteed by * * * any * * * constitutional provision" (475 F.Supp. at 1023).

We return the matter to the trial court for a determination of damages stemming from the body search. The decision is otherwise affirmed, costs to be borne equally by the respective parties.

SWYGERT, Circuit Judge, dissenting from the order denying the petition for rehearing.

I am deeply troubled by this court's holding that the dragnet inspection of the entire student body of the Highland Senior and Junior High Schools by trained police dogs and their dog-handlers did not constitute a search under the Fourth Amendment. No doctrine of *in loco parentis* or diminished constitutional rights for children in a public school setting excuses this alarming invasion by police and school authorities of the constitutional rights of thousands of innocent children. Any attempt by the district court or this court to portray the events of March 23, 1979 as only a deviation in degree from the normal school day is grossly misplaced. In my view, those events were a deviation in kind and constituted a danger not only to the psychological well-being of the children but to the fundamental concepts of our Bill of Rights.

Although a number of incidents involving alcohol, drugs, or related paraphernalia had been reported to school authorities, no more than twenty-one out of 2,780 students had been involved. School authorities had to concede that, in general, conditions at the Highland schools were at least average and could well have been better than at most other schools. At the time of the raid, they possessed no specific information as to particular drugs or contraband, transactions or events, or drug suppliers or abusers. Nevertheless, over a period of weeks a scheme was developed and executed that implicated all 2,780 students and subjected all to a humiliating search by police dogs.

The raids began at 8:45 A.M. on March 23, 1979. The searchers were divided into teams consisting of at least one dog, one dog handler, one school administrator or teacher, and one or two uniformed police officers. Fourteen dogs were on hand. For the duration of the raid, all schoolhouse doors were either locked or tightly guarded by police and school officials. All students were detained in their first period classrooms; any late arrivers or visitors were led to and detained in a room set aside for that purpose. No student was allowed to leave his or her classroom, and if any claimed to need to use the lavatory facilities, school or police authorities escorted and watched over them.

Every student was instructed to place his belongings in view and his hands on his desk. Girls placed their purses on the floor between their feet. The teams of searchers moved from room to room, and from desk to desk. Every single student was sniffed, inspected, and examined at least once by a dog and a joint school-police team. The extraordinary atmosphere at the school was supplemented still further when representatives of the press and other news media, invited in by school authorities, entered the schoolhouses and classrooms during the raid and observed the searches while in progress.

The raid lasted about three hours. After the sniffing and examination of 2,780 students, the searchers found fifteen high school students—and no junior high students—in possession of illicit materials. School and police authorities removed five high school students—three girls and two boys—from their classrooms and subjected them to personal interrogations and thorough, but not nude, searches. None was found to be in possession of any contraband. Three or four junior high students were similarly treated and cleared. Four junior high students—all girls—were removed from their classes, stripped nude, and interrogated. Not one of them was found to possess any illicit material.

The district judge held in an opinion adopted by a panel of this court that "the presence of the dog and its trainer within the classroom, also at the request and supervision of the school officials, was only an aide to that official's observation of students. . . . [T]he sniffing of a trained narcotic detecting canine is not a search." I strongly disagree. In my view, the circumstances of March 23 can hardly be likened to the observations of a school administrator, sniffing the air about him as he goes about his business. Here there was evidence that the trained dogs ran their noses along pupils' legs, actually touching the bodies of the students.

The cases cited by the district court as holding that sniffing dogs do not constitute a search are totally inapposite because in those cases the dogs were sniffing inanimate and unattended objects rather than people. Here the intrusive probings by the dogs were in no sense mere observation of " 'physical characteristics . . . constantly exposed to the public,' . . . [but] constituted the type of 'severe, though brief, intrusion upon cherished personal security' that is subject to constitutional scrutiny." Cupp v. Murphy, 412 U.S. 291, 295, 93 S.Ct. 2000, 2003, 36 L.Ed.2d 900 (1973) (citations omitted). See also United States v. Kenaan, 496 F.2d 181 (1st Cir. 1974). We need not speculate afar about the psychological trauma suffered by the students during this mass search. The accusing finger of the police may well remain for a lifetime upon these young, impressionable minds.

Had a warrant properly been sought, I am convinced that none could have issued consistent with the Fourth Amendment. The police and school officials neither possessed nor attempted to gain specific information about any particular student. There was also no information as to any particular drug or contraband transaction or event. Thus, all 2,780 students were under suspicion, and there was no known crime.

A search under these conditions is unconstitutional under either a reasonable suspicion or a probable cause standard. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). I cannot consider this a "school" case because the mass search was planned and executed with extensive police involvement rather than solely by school personnel. But even considered in the context of "school" cases, there was no reasonable suspicion here to justify the mass search. See M. M. v. Anker, 477 F.Supp. 837 (E.D.N.Y.), aff'd, 607 F.2d 588 (2d Cir. 1979). Nor was the constitutional violation abrogated by the fact that the police did not plan any arrests. The Fourth Amendment protects against unreasonable searches because of "the right of the people to be secure in their persons" whether or not an arrest would necessarily follow.

Violations of a person's "cherished personal security," * whether engaged in by violent antisocial elements of our society or by overzealous, insensitive police, must be equally condemned. Both should be dealt with in accordance with legal consequences that foster deterrence.

FAIRCHILD, Chief Judge, dissenting.

I voted for rehearing en banc and surely join in Judge Swygert's concern whether

---

* Cupp v. Murphy, 412 U.S. 291, 295, 93 S.Ct. 2000, 2003, 36 L.Ed.2d 900 (1973).

the dogs were used in a manner which itself without further individual intervention invaded protected privacy rights. I further question whether the record demonstrates that the responses of the dogs were sufficiently reliable indicators of the presence of contraband to constitute probable cause justifying the individual searches. After all, it appears that although the canine response raised suspicion toward 50 students, only 15 were found to possess contraband. As to plaintiff Doe, I gather that she probably caused the dog to respond to her because she had been playing that morning with her own dog which was in heat. I was not, however, a member of the panel, did not read the briefs on appeal, nor hear oral argument with opportunity to question counsel, nor examine the record. I therefore go no further toward expressing at this stage an opinion on the merits of the appeal.

HARLINGTON WOOD, Jr., Circuit Judge, dissenting.

As I believe this case raises significant issues with an impact beyond these particular parties, I respectfully dissent. I join generally in the concerns expressed by my other dissenting colleagues. However, without the benefit of an *en banc* hearing, I am reluctant to express an opinion on the merits of those issues.

CUDAHY, Circuit Judge, dissenting.

Although I do not feel in a position to express specific views on the merits, I share in the concerns so eloquently expressed by my colleagues.