1998 DSD 27

Rebecca L. KONOP, as Guardian ad litem for Amber Konop, a minor, Plaintiff,

v.

NORTHWESTERN SCHOOL DISTRICT, Raymond Sauerwein, and Paloma Patnode, Defendants.

Donna GENZLER, as Guardian ad Litem for Lacy A. Genzler, a minor, Plaintiff,

v.

NORTHWESTERN SCHOOL DISTRICT, Raymond Sauerwein, and Paloma Patnode, Defendants.

Nos. Civ. 97–1022, Civ. 97–1021.

United States District Court, D. South Dakota, Northern Division.

Nov. 10, 1998.

Bruce M. Ford, Ford Law Office, Watertown, SD, for Plaintiff.

Greg L. Peterson, Bantz, Gosch, Cremer, Peterson & Sommers, Aberdeen, SD, for Defendant.

## MEMORANDUM OPINION AND ORDER

KORNMANN, District Judge.

### INTRODUCTION

[¶ 1] These cases involve Amber Konop ("Konop") and Lacy Genzler ("Genzler"), who were in 1997 eighth grade students at the Northwestern School District in Mellette, South Dakota. They were strip searched by Paloma Patnode ("Patnode"), a music teacher, upon order of or suggestion from Raymond Sauerwein ("Sauerwein"), the Northwestern Principal. Plaintiffs in both cases seek a declaratory judgment that strip searches (which plaintiffs allege are "authorized" by Northwestern school policy) are unconstitutional, being in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiffs allege pendent state law claims against the individual defendants for intentional infliction of emotional distress. They also allege a pendent state law battery claim against Patnode.

[¶ 2] Defendants in both cases have filed a motion for summary judgment, claiming defendants are entitled to qualified immunity from damages or, in the alternative, that as a matter of law, the searches were not unreasonable. The Court rejects out of hand the claim by defendants that, as a matter of law, the searches were not unreasonable. The questions are thus reduced to the claims of qualified immunity. Defendants also moved for summary judgment on the state law claims, contending that, as a matter of law, there is an absence of evidence of intentional misconduct. Finally, defendants contend they are entitled to summary dismissal of the claim for declaratory relief, arguing there is no continuing controversy and plaintiffs have other adequate remedies. These cases are consolidated by the Court pursuant to Fed. R.Civ.P. 42(a).

### DISCUSSION

[¶ 3] Plaintiffs bring this action against Sauerwein and Patnode both as individuals and as school officials. Such claims dealing with their official capacities are equivalent to claims against Northwestern as their employer. Such claims require proof that a Northwestern policy or custom violated plaintiffs' rights. The only type of immunity available as to such claims would be the type available to Northwestern. *See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361–62, 116 L.Ed.2d 301 (1991). Claims against the individual defendants personally, i.e. for their individual actions in the course of their official duties, do not require proof of any policy and qualified immunity is available as a possible defense as to such claims. *Id.* 112 S.Ct. at 362.

### I. Declaratory Relief

[¶ 4] Defendants contend that the Court should decline to grant plaintiffs' request for declaratory relief because (a) there is no continuing controversy and (b) plaintiffs have other adequate remedies at law. The Federal Declaratory Judgment Act provides

that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Pursuant to Fed.R.Civ.P. 57, the existence of other remedies does not preclude a judgment for declaratory relief in cases where it is appropriate.

■■■ [¶ 5] "The Declaratory Judgment Act is not a command to the district court to take jurisdiction, and the exercise of jurisdiction under the Act lies within judicial discretion." *Universal Underwriters Ins. Co. v. Wagner,* 367 F.2d 866, 871 (8th Cir.1966). "Declaratory relief is appropriate '(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Guerra v. Sutton,* 783 F.2d 1371, 1376 (9th Cir.1986), (quoting *Bilbrey by Bilbrey v. Brown,* 738 F.2d 1462, 1470 (9th Cir.1984)); *Alsager v. District Court of Polk County, Iowa (Juvenile Division),* 518 F.2d 1160, 1163–1164 (8th Cir.1975), (quoting E. Borchard, Declaratory Judgments 299 (2d ed.1941)).

[¶ 6] Defendants devote a great deal of effort in their briefs to argue that school children's constitutional rights, as they apply to searches, are not well defined. In fact, defendants assert that no reasonable school official would have known that strip searching the plaintiffs under the existing circumstances would violate the plaintiffs' Constitutional rights. In view of the contentions of the defendants, this is clearly a case in which "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue" and "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."

A court declaration is a message not only to the parties but also to the public and has significant educational and lasting importance. It would be another marker along the road to implementation of Fourth Amendment rights. As appellants point out, courts that have held school searches unconstitutional have generally found it appropriate to enter declaratory relief even where defendants may also have been separately held entitled to immunity from damages.

*Bilbrey by Bilbrey v. Brown,* 738 F.2d at 1471. Declaratory relief is appropriate here.

## II. Qualified Immunity

■■■ [¶ 7] The United States Supreme Court first afforded school officials qualified immunity from damages in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The Supreme Court held that "in the specific context of school discipline ... a school [official] is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student." *Id.,* 420 U.S. at 322, 95 S.Ct. at 1001. In a later case, the Supreme Court announced an objective test: defendants are entitled to qualified immunity "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "The right must be clearly established in a particularized sense: 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Prosser v. Ross,* 70 F.3d 1005, 1007 (8th Cir.1995), (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald,* 457 U.S. at 818–819, 102 S.Ct. at 2738. "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Id.* at 819, 102 S.Ct. at 2739.

[¶ 8] "Whether a given set of facts entitles the defendant to qualified immunity is a question of law which may be decided on summary judgment. However, if there is a dispute over facts that might affect the outcome of the suit under the law of qualified immunity, there can be no summary judgment." *Creighton v. Anderson*, 922 F.2d 443, 447 (8th Cir.1990) (citations omitted).

> Resolution of the qualified immunity defense in the summary judgment context requires a step-by-step analysis. First, the court must determine whether the plaintiff has alleged the violation of a constitutional right. Second, the court must determine whether the right was "clearly established" at the time of the alleged violation. Third, if the constitutional right was clearly established, the court must determine whether there are material facts in dispute regarding the objective reasonableness of the defendant's conduct in light of the law and the facts known to the defendant at the time. Lastly, if the facts are undisputed, and the defendant could be found to have acted reasonably if the conduct is viewed objectively, then summary judgment must be granted for the defendant.

*Doran v. Condon*, 5 F.Supp.2d 1067, 1072 (D.Neb.1998), citing *Cross v. City of Des Moines*, 965 F.2d 629, 631–33 (8th Cir.1992).

[¶ 9] The question in this case as to qualified immunity is "whether a reasonable [school official] could have believed [Patnode's strip search] to be lawful, in light of clearly established law and the information [Patnode and Sauerwein] possessed. [Defendants'] subjective beliefs about the search are irrelevant." *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987), quoted in *Gainor v. Rogers*, 973 F.2d 1379, 1384 (8th Cir.1992). "The issue on the merits is whether the defendants *violated the law* when the [strip search] was made, whereas the immunity question is whether the [defendants] *violated clearly established law* when the [search] was made." *Gainor v. Rogers*, 973 F.2d at 1383.

## A. Constitutional Right

[¶ 10] "It is now beyond dispute that 'the Federal Constitution, by virtue of the Fourteenth Amendment, prohibits unrea-sonable searches and seizures by state officers.' Equally indisputable is the proposition that the Fourteenth Amendment protects the rights of students against encroachment by public school officials." *New Jersey v. T.L.O.*, 469 U.S. 325, 334, 105 S.Ct. 733, 738, 83 L.Ed.2d 720 (1985), (quoting *Elkins v. United States*, 364 U.S. 206, 213, 80 S.Ct. 1437, 1442, 4 L.Ed.2d 1669 (1960)). The United States Supreme Court has recognized that "even a limited search of the person is a substantial invasion of privacy." *New Jersey v. T.L.O.*, 469 U.S. at 337, 105 S.Ct. at 740, citing *Terry v. Ohio*, 392 U.S. 1, 24–25, 88 S.Ct. 1868, 1881–1882, 20 L.Ed.2d 889 (1968). Plaintiffs have alleged in their separate complaints that their Fourth Amendment rights to be free from unreasonable searches, which rights are applicable to school officials by virtue of the Fourteenth Amendment, were violated. Plaintiffs meet the first prong in the analysis of a qualified immunity defense in the context of a summary judgment motion.

## B. Clearly Established

[¶ 11] The defendants assert, and correctly so, that there is apparently no case decided by the United States Supreme Court, by the United States Court of Appeals for the Eighth Circuit, by any District Court in the Eighth Circuit, or by the South Dakota Supreme Court involving strip searches in a school setting. They then argue that the law in the Eighth Circuit therefore cannot be "clearly established." Defendants rely on *Jenkins By Hall v. Talladega City Board of Education*, 115 F.3d 821, 827 n. 4 (11th Cir. 1997), cert. den. —— U.S. ——, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997), in arguing that the law can be clearly established in the District of South Dakota only by decisions from the United States Supreme Court, the United States Court of Appeals for the Eighth Circuit, U.S. District Courts in the District of South Dakota, or the South Dakota Supreme Court. The Court rejects this contention, relying on Eighth Circuit precedent.

> This rule would enable a [school] official to claim immunity where several other circuit, district or state courts had condemned similar practices on the basis of

the federal Constitution, so long as a [South Dakota] court, or the district court for the [District of South Dakota] or the Eighth Circuit had not yet done so. While the identity of a court and its geographical proximity may be relevant in determining whether a reasonable official would be aware of the law (as might the dissemination of information within the pertinent profession and the frequency of similar litigation), we do not think that the defendants' per se rule adequately captures what the Supreme Court has meant by its objective test for what is "clearly established."

*Johnson–El v. Schoemehl,* 878 F.2d 1043, 1049 (8th Cir.1989).

In order to determine whether a right is clearly established, it is not necessary that the Supreme Court has directly addressed the issue, nor does the precise action or omission in question need to have been held unlawful. In the absence of binding precedent, a court should look to all available decisional law including decisions of state courts, other circuits and district courts. . . .

*Burnham v. Ianni,* 119 F.3d 668, 677 (8th Cir.1997), (quoting *Hayes v. Long,* 72 F.3d 70, 73–74 (8th Cir.1995)).

[¶ 12] Taking the argument of defendants to its logical conclusion would tell us that there must be factual identity between a prior case and the case under consideration. This would result in "absolute immunity", not "qualified immunity." In other words, any school official would receive one "bite of the apple", regardless of the nature of the conduct. By way of example which example is admittedly extreme, if there was no reported case to the effect that school officials may not chain students to desks throughout the school day, the law in this regard, according to the argument of defendants, would not be "clearly established." This court, in rejecting the arguments of the defendants in this regard, also relies on *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). *Lanier* dealt with 18 U.S.C. § 242, the criminal law counterpart to 42 U.S.C. § 1983. The implication of *Lanier* is that to possibly establish civil rights liability (i.e. to "get past" the qualified immunity defense and to allow the jury as the finder of the facts to decide the facts), there must be "fair warning" of the constitutional right or rights and there is no requirement that this warning be found in prior Supreme Court precedent or factually similar precedent elsewhere. *Lanier* also stands for the proposition that general principles of law can provide fair warning.

[¶ 13] *Jenkins,* one of the cases upon which defendants rely, involved the strip search of two eight-year old elementary students in an attempt to find seven dollars allegedly stolen from classmates. The majority held that on May 1, 1992, the date of the relevant conduct, the law was not clearly established such that all reasonable teachers and school officials reasonably should have known that the search was in violation of the Fourth Amendment. The majority devoted a considerable portion of the opinion to criticizing the Supreme Court's test, as enunciated in *T.L.O.,* as being too general to serve as a proper guide. It is true that the dissenters in *T.L.O.* warned of this somewhat imprecise test and the difficulty of applying it in cases to follow. Justice Brennan, joined by Justice Marshall, described the Supreme Court's standard as "unclear," *T.L.O.,* 469 U.S. at 354, 105 S.Ct. 733, and "an unguided balancing test," *Id.* at 356, 105 S.Ct. 733. Justice Stevens was even more critical: "As compared with the relative ease with which teachers can apply the probable-cause standard, the amorphous 'reasonableness under all the circumstances' standard freshly coined by the Court today will likely spawn increased litigation and greater uncertainty among teachers and administrators." *Id.* at 365, 105 S.Ct. 733. The majority in *T.L.O.* obviously intended to free school officials from any requirement that they meet the law enforcement standard of "probable cause." In doing so, they may have inadvertently caused even more difficulty for school officials attempting to decide whether a search would be reasonable under all the circumstances. "[T]he legal question of qualified immunity is itself fact-intensive." *Reece v. Groose,* 60 F.3d 487, 490 (8th Cir.1995).

Qualified immunity protects state actors from civil liability when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known.' *Reece,* 60 F.3d at 491 (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727). In ruling upon a defense of qualified immunity, we first determine whether the law that the defendant is accused of having violated was clearly established and then examine the information possessed by the defendant at the time of the alleged violation. *See id.* at 489 (*citing Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Thus the determination of a qualified immunity defense is 'fact intensive.' *See id.* at 490.

*Collins v. Bellinghausen,* 153 F.3d 591, 595, 1998 WL 458640, 3 (8th Cir.1998). Whether one may like it or not, *T.L.O.* is the law of the land. We must also keep in mind that, prior to *T.L.O.,* teachers had much less guidance. Some courts had held that school searches could only be conducted based upon probable cause and others had held that school children enjoyed no Fourth Amendment protection.

[¶ 14] The ultimate question for the purpose of the summary judgment motion dealing with qualified immunity, with regard to school strip searches, is whether *T.L.O.* had established with "obvious clarity" that the school searches at issue were in violation of the Fourth Amendment if conducted unreasonably. The holding in *T.L.O.* is not, in any way, unclear or confusing. The holding may be rather difficult in its application since it requires a fact intensive inquiry but this does not change the fact that school officials may not, since *T.L.O.* was announced, unreasonably search a student or the student's belongings. This is clearly established law from the United States Supreme Court. The defendants in the present case are, in effect, urging this court to find that the *T.L.O.* decision is unclear. This court is being asked to adopt the position of the dissenters in *T.L.O.* and the court, of course, cannot do that.

[¶ 15] "A right is 'clearly established' when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Whisman v. Rinehart,* 119 F.3d 1303, 1309 (8th Cir.1997), (quoting *Birkenholz v. Sluyter,* 857 F.2d 1214, 1216 (8th Cir.1988)). "In determining whether the legal right at issue is clearly established, this circuit applies a flexible standard, requiring some, but not precise factual correspondence with precedent, and demanding that officials apply general, well-developed legal principles." *Whisman Through Whisman v. Rinehart,* 119 F.3d at 1309, (quoting *J.H.H. v. O'Hara,* 878 F.2d 240, 243 (8th Cir.1989)).

[¶ 16] Plaintiffs' Fourth Amendment right to be free of unreasonable searches in the school setting was clearly established at the time of the searches. *New Jersey v. T.L.O.,* supra. *T.L.O.* established in 1985 that a search in the school setting must be justified and reasonably related in scope to the circumstances which are claimed to have justified the search. 469 U.S. at 341–342, 105 S.Ct. at 742–743. A search of students by teachers or other school officials (not involving law enforcement officials), to be "justified at its inception," must be based on reasonable grounds to suspect that the search will produce evidence that the students had violated or are violating either the law or school rules. Such a search is permissible in scope only when what is done by the school employee is reasonably related to the objectives of the search and "not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* It was also clearly established that strip searches, generally, are not reasonable. *See Doe v. Renfrow,* 631 F.2d 91, 92–93 (7th Cir.1980). Although *Doe v. Renfrow* was decided before *T.L.O.* and *Harlow v. Fitzgerald,* Justice Stevens, in his separate opinion concurring in part and dissenting in part in *T.L.O.,* quoted from *Doe v. Renfrow* and also wrote that "[o]ne thing is clear under any standard—the shocking strip searches that are described in some cases have no place in the schoolhouse.... To the extent that deeply intrusive searches are ever reasonable outside the custodial context, it surely must only be to prevent imminent, and serious harm." *T.L.O.,* 469 U.S. 325, 382, 105 S.Ct. 733, 764, n. 25, 83 L.Ed.2d 720 (Stevens, J., concurring).

[¶ 17] The Seventh Circuit held in 1993 that "a nude search of a student by an administrator or teacher of the opposite sex would obviously violate [the *T.L.O.*] stan-

dard." Moreover, a highly intrusive search in response to a minor infraction would similarly not comport with the sliding scale advocated by the Supreme Court in *T.L.O.*" *Cornfield by Lewis v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir.1993). The Seventh Circuit further held that "as the intrusiveness of the search of a student intensifies, so too does the standard of Fourth Amendment reasonableness. What may constitute reasonable suspicion for a search of a locker or even a pocket or pocketbook may fall well short of reasonableness for a nude search." *Id.* at 1321. The Seventh Circuit reiterated its pre-*T.L.O.* holding in *Doe v. Renfrow*, 631 F.2d at 92–93: "It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human decency." The Seventh Circuit concluded that the reasonable cause standard announced in *Doe v. Renfrow* was consistent with *T.L.O. Cornfield*, 991 F.2d at 1324. Finally, the Seventh Circuit clearly put school officials on notice in 1993 that

> The impact of the search will also vary with the age of the child. Perhaps counterintuitively, a very young child would suffer a lesser degree of trauma from a nude search than an older child. As children go through puberty, they become more conscious of their bodies and self-conscious about them. Consequently, the potential for a search to cause embarrassment and humiliation increases as children grow older.

*Id.* at 1321 n. 1. The Seventh Circuit concluded that the search in *Cornfield* was reasonable.

> On the one hand, the sixteen-year-old Cornfield was of an age at which children are extremely self-conscious about their bodies; thus, the potential impact of a strip search was substantial. However, given Spencer and Frye's suspicion that Cornfield was crotching drugs, their conclusion that a strip search was the least intrusive way to confirm or deny their suspicions was not unreasonable. As administered, two male school personnel performed the search and did so in the privacy of the boys' locker room.... As

Cornfield changed, Spencer and Frye observed from a certain distance away to ensure Cornfield could not conceal any drugs or other contraband he was suspected of carrying. In addition, Spencer and Frye did not physically touch him or subject him to a body cavity search, nor did they have him suffer the indignity of standing naked before them but allowed him to put on a gym uniform while they searched his street clothes.

*Id.* at 1323. One would conclude from the Seventh Circuit decision that physically touching a student and having a student suffer the indignity of standing naked before them would be impermissible.

[¶ 18] The Sixth Circuit held in *Williams By Williams v. Ellington*, 936 F.2d 881 (6th Cir.1991), that a search was justified. In that case, the school principal received information on a Tuesday that Williams and another girl, Michelle, offered a student a white powdery substance in a clear glass vial and that Williams and Michelle had sniffed the powder. The claim was investigated over the course of the week and found to be reliable. On Friday, the principal again received information that Williams and Michelle were in possession of the white powdery substance. The two students were questioned and Michelle actually produced contraband from her purse which did not match the description of the vial. A search of Williams' locker and purse failed to reveal the suspected contraband and she was thereafter, in the presence of a female secretary, asked to empty her pockets, remove her T-shirt, and required to lower her blue jeans to her knees. The secretary pulled on the elastic of her undergarments to see if anything would fall out. The student was then required to remove her shoes and socks. *Id.* at 882–883. The Sixth Circuit held that, under *T.L.O.*, the defendants were not unreasonable in suspecting, based on the information available at the time, "that a search of Williams would reveal evidence of drugs or drug use. Further, Defendants were not unreasonable, in light of the item sought (a small vial containing suspected narcotics), in conducting a search so personally intrusive in nature." *Id.* at 887. The investigation in *Williams* was conducted over the course of a week and there was an

independent basis to believe that the defendant possessed contraband. The Sixth Circuit ruled that in the absence of prior Sixth Circuit precedent and under the standards in *T.L.O.*, the defendants were entitled to qualified immunity. *Id.* at 889.

[¶ 19] The Sixth Circuit held in *Tarter v. Raybuck*, 742 F.2d 977 (6th Cir.1984), that "the authority of the school official would not justify a degrading body cavity search of a youth in order to determine whether a student was in possession of contraband in violation of school rules. There the fourth amendment and privacy interests of the youth would clearly outweigh any interest in school discipline or order which might be served by such a search." *Id.* at 982–983. The Sixth Circuit relied upon *Doe v. Renfrow.*

[¶ 20] A United States District Court held in *Oliver v. McClung*, 919 F.Supp. 1206 (N.D.Ind.1995), that strip searching seventh grade girls searching for $4.50 was not reasonable. In that case, following gym class two female students reported to their teacher that the money was missing. The teacher reported the alleged theft to the principal who ordered the female students to stay in the gym. Their lockers, book bags, shoes and socks were searched. The principal then ordered a female teacher and a female substitute food service worker to take the students into the locker room and search their bras. Some of the students were ordered to remove their shirts, some were required to remove, loosen or shake their bras, some to loosen or remove their pants, and one student's waist band on her pants was checked by sticking a thumb in and moving it around the waist. *Id.* at 1211. The District Court held:

> In the present case, the Plaintiffs were in the seventh grade, making them all about thirteen years old at the time of the search. Perhaps even at that tender age, such a search might be argued to be reasonable if McClung, Miller and Stewart had evidence that certain of the girls were in possession of illegal drugs or weapons. It cannot be disputed that drugs and violence plague our nation's schools. Contraband such as drugs and weapons can constitute a threat of imminent harm to the students who possess them, to other students, and to teachers and other school personnel. However, that was simply not the situation in the present case.
>
> In light of the case law as it existed at the time, especially the Supreme Court's decision in *T.L.O.* and the Seventh Circuit's decision in *Doe v. Renfrow*, the argument that it is not unreasonable to conduct a strip search of young school girls in an effort to recover the grand sum of four dollars and fifty cents is simply not convincing. As the Plaintiffs properly point out, *T.L.O.* was decided nearly eleven years ago, and *Renfrow* was decided some fifteen years ago. The mere fact that Defendants can cite a few cases since then where strip searches have been held to be reasonable under certain circumstances does not change the facts of this case or the state of the law at the time this search was conducted. This Court finds that the Plaintiffs have met their burden of establishing that there was a "clearly established ... constitutional right of which a reasonable person would have known." In fact, McClung, by his own testimony, admitted that he felt the search had gone too far. He began calling the girl's (sic) parents the very day the search took place to explain what had happened, and he apologized to the girls the next school day. While McClung's subjective perception of what took place is irrelevant to qualified immunity analysis in light of *Harlow v. Fitzgerald*, supra, it is nonetheless revealing when making the determination of what "a reasonable person would have known" under these same circumstances.

*Id.* at 1218. The District Court denied qualified immunity.

[¶ 21] In *Widener v. Frye*, 809 F.Supp. 35 (S.D.Ohio 1992), *aff'd* 12 F.3d 215 (6th Cir. 1993), a teacher detected the odor of marijuana emanating from a male student. A security guard was called to escort the fifteen-year-old to the Dean's office. He observed the student acting in a lethargic manner and also noticed the odor of marijuana. He underwent a pat-down search under the arms and agreed to empty his pockets and have his jacket and bag searched. None of the searches produced any evidence of posses-

sion of marijuana. The plaintiff was asked to lift his shirt and to remove his shoes and socks and he complied with these requests. He was asked if he was wearing gym shorts, to which the plaintiff responded affirmatively. The plaintiff lowered his pants and was asked to pull the shorts tight around his crotch area to permit the defendants to observe whether he was concealing any drugs. Like the previous searches, this produced no evidence of drug possession. *Id.* at 36. The District Court held that the search was reasonable under the circumstances and based upon the legal standards in *T.L.O.*

[¶ 22] In *Singleton v. Board of Education,* 894 F.Supp. 386 (D.Kan.1995), a thirteen year old male student left gym class to meet with an assistant principal at the school office. An adult woman met the plaintiff outside the office and accused plaintiff of stealing $150.00 from the front seat of her car. A second assistant principal observed the argument. The woman was questioned and reasserted that the plaintiff stole the money and that plaintiff's mother sold cocaine. The defendant took the plaintiff into his office and told plaintiff that he needed to ask him some questions about being in possession of a large amount of cash or crack cocaine or both. The defendant reached into plaintiff's cut-off jeans pockets and turned them inside out, took off the plaintiff's shoes and socks and searched them, patted the plaintiff down in the crotch area, then unbuttoned plaintiff's cut-offs and lowered them to his knees, searched the inside waist band of his boxer shorts, had plaintiff hold up his arms while defendant removed plaintiff's shirt and shook it, searched the pockets of the shirt and unrolled the collar. Defendant then searched plaintiff's coat, books, and papers in his locker. These searches uncovered no money or contraband. *Id.* at 388–389. The District Court held that at the time of the searches, the law with regard to student searches was clearly established. *Id.* at 390, citing *T.L.O.*

Based on the facts of this case, the court finds that the search of plaintiff was justified at its inception. This test focuses on the level of suspicion that the plaintiff had violated either the law or school rules. The potential infraction in this case included not only the possession of a large sum

of money at school, but also the possibility that the money had been stolen. The statements of Ms. Williams, alleging that plaintiff had stolen a large sum of money from her and that plaintiff had been in trouble with the police, provided reasonable grounds for suspecting that a search would turn up evidence of such a violation. A number of courts have held that information provided by an informant can serve as a basis for a reasonable suspicion that a student may be engaged in illegal activity. *See,* e.g., *Williams v. Ellington,* 936 F.2d 881, 887–89 (6th Cir.1991).

The search was also reasonable in its scope in light of plaintiff's age and sex and the nature of the suspected infraction. The search was conducted in the privacy of the principal's office with only two male administrators present. Plaintiff was never required to remove his underwear, and he was not touched inappropriately. Courts have found similar student searches to be reasonable in scope. *See Cornfield v. Consolidated High School Dist. No.* 230, 991 F.2d 1316 (7th Cir.1993); *Williams v. Ellington,* 936 F.2d 881 (6th Cir.1991); *Widener v. Frye,* 809 F.Supp. 35 (S.D.Ohio 1992), aff'd, 12 F.3d 215 (6th Cir.1993). *Id.* at 390–391. The court found that plaintiff's constitutional rights were not violated when school officials searched him and his locker.

[¶ 23] In *Burnham v. West,* 681 F.Supp. 1160 (E.D.Va.1987), a school official on different occasions searched students' lockers, book bags, and purses looking for magic markers (a school official had discovered the defacement of school property) "walkmen" or radios (which some unidentified students had been seen carrying off the school bus), and marijuana (which a teacher had smelled in the hallway during classes). The District Court held, relying on *T.L.O.*, that "school children have a reasonable expectation of privacy in personal articles carried with them inside purses or wallets" and book bags. *Id.* at 1164. The District Court held that the searches were unconstitutional because:

The searches in the case at bar were all conducted in an atmosphere devoid of individualized suspicion. The United States

Supreme Court has not decided whether individualized suspicion is a necessary component of the reasonableness standard applicable to school searches, but it has strongly suggested that this question should be answered by recourse to the same reasonableness balancing analysis applied in other search cases. Exceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal and where "other safeguards" are available "to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.' "

*Id.* at 1165.

The Walkman search was unjustified at its inception because there were no reasonable grounds to suspect that the search of any given student would turn up evidence of that student's violation of any law or school rule. At best, it would have been reasonable to suspect that some unknown members of the student body had Walkmen or radios in their possession. The marijuana search illustrates even more clearly the unjustifiable nature of the sweep searches in this case, because suspicion in this instance could not reasonably be narrowed even to the entire student body.... While the Court readily accepts the proposition that drug abuse is a serious problem, defendants have offered no evidence concerning its prevalence at AHS. Smuggling Walkmen or radios into school is obviously a less serious problem than drug abuse, and there is likewise no evidence of its prevalence at AHS. Defendants have made no sufficient showing of exigency requiring an immediate search without particularized suspicion, while plaintiffs, on the other hand, have shown a striking paucity of investigatory measures reasonably calculated to narrow the field of suspects. Because the searches were unjustified ab initio for lack of individualized suspicion, the Court need not inquire into the actual search techniques used to assess the permissibility of their scope.

*Id.* at 1165–66.

General searches have uniformly been condemned in the absence of other factors supporting reasonableness.... Under the strong majority view, the Fourth Amendment requires individualized suspicion in the mass drug testing context generally.... Individualized suspicion is even required in the prison setting, at least with regard to strip searches of visitors.... Finally, and most importantly, the balance this Court strikes in favor of individualized suspicion accords with the decisions that have addressed the issue in the school setting. *E.g., Horton v. Goose Creek Independent School District,* 690 F.2d 470, 481–82 (5th Cir.1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983); *Jones v. Latexo Independent School District,* 499 F.Supp. at 234; *Bellnier v. Lund,* 438 F.Supp. 47, 54 (N.D.N.Y. 1977); *Kuehn v. Renton School District No. 403,* 103 Wash.2d 594, 694 P.2d 1078, 1081 (1985).

*Id.* at 1166. The defendants in *Burnham* were nonetheless granted qualified immunity because the issue of individualized suspicion after *T.L.O.* "has not been authoritatively decided by the United States Supreme Court, the United States Court of Appeals for the Fourth Circuit, or the Supreme Court of Virginia." *Id.* at 1168. This is contrary to the rule of law in the Eighth Circuit as already discussed.

[¶ 24] In *Cales v. Howell Public Schools,* 635 F.Supp. 454 (E.D.Mich.1985), a 15 year old tenth grade student was seen in the parking lot "ducking" behind a parked car when she was supposed to be in class. When confronted by the security guard she gave a false name. She was escorted to the office where she was required to empty the contents of her purse. Her purse contained "readmittance slips" which were improperly in her possession. She was then instructed to turn her jean pockets inside-out, completely remove her jeans and was then required to bend over so defendant could visually examine the contents of her brassiere. The basis for the search was the belief of the defendant that the student was in possession of illegal drugs. *Id.* at 455. The District Court held:

This Court does not read *TLO* (sic) so broadly as to allow a school administrator the right to search a student because that student acts in such a way so as to create a

reasonable suspicion that the student has violated some rule or law. Rather, the burden is on the administrator to establish that the student's conduct is such that it creates a reasonable suspicion that a specific rule or law has been violated and that a search could reasonably be expected to produce evidence of that violation.

*Id.* at 457. The District Court held the search was not reasonable at its inception. *Id.*

[¶ 25] Most interesting in *Cales* is the qualified immunity analysis: "The events which served as the basis for this action occurred long before the Supreme Court's holding in *TLO* (sic) and the Sixth Circuit's ruling in *Tarter v. Raybuck,* 742 F.2d 977 (6th Cir. 1984). However, the principals (sic) underlying those decisions were clearly established at the time of this action." *Id.* at 457. The District Court thus concluded that the defendants were not entitled to qualified immunity. *Id.* at 458.

[¶ 26] *T.L.O.* has been applied time and time again and certain rules are clear: (1) a strip search is not justified absent individualized suspicion unless there is a legitimate safety concern (e.g. weapons); (2) school officials must be investigating allegations of violations of the law or school rules and only individual accusations justify a strip search; and (3) strip searches must be designed to be minimally intrusive, taking into account the item for which the search is conducted. The reasonableness standard set forth in *T.L.O.* was clearly established and should have been applied by defendants. It was in fact applied time after time by various Circuit and District Courts to factual scenarios having some similarity to the present case. Plaintiffs meet the second prong in the analysis of a qualified immunity defense in the context of a summary judgment motion.

## C. Material Facts

[¶ 27] The Court must determine whether there are material facts in dispute as to whether the defendants' actions violated clearly established law. *George v. City of St. Louis,* 26 F.3d 55, 57 (8th Cir.1994). Defendants assert in their reply brief that the principle that the facts are construed most favorably to the non-movant does not apply in the context of a qualified immunity

defense. Defendants cite an unpublished decision from the District of South Dakota, *Liebe v. Norton,* No. 96–5082 (December 5, 1997). *Liebe v. Norton* held that when reasonable minds could differ as to whether defendants' conduct [in ordering and conducting the strip searches] was justified, the balance tips in favor of the defendant. However, the facts upon which the Court must rely in determining just what that conduct was must be construed in the light most favorable to the plaintiffs. See *Mitchell v. Forsyth,* 472 U.S. 511, 529, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985), *Murphy v. State of Arkansas,* 127 F.3d 750, 755 (8th Cir.1997), *Burnham v. Ianni,* 119 F.3d 668, 673 (8th Cir.1997), *Otey v. Marshall,* 121 F.3d 1150, 1155 (8th Cir.1997), *Eagle v. Morgan,* 88 F.3d 620, 624 (8th Cir.1996), *Heidemann v. Rother,* 84 F.3d 1021, 1027 (8th Cir.1996), *Kinney v. Kalfus,* 25 F.3d 633, 634 (8th Cir.1994), and *Mangan v. Cullen,* 870 F.2d 1396, 1398 (8th Cir.1989). The contention of defendants that the facts are to be construed in their favor is also rejected, given the directive in *Prater v. Dahm,* 89 F.3d 538, 539 (8th Cir.1996), that even on an appeal from a denial of qualified immunity, the facts must be viewed in the light most favorable to the person charging the violation of rights. See also *Foulks v. Cole County, Mo.,* 991 F.2d 454, 456 (8th Cir.1993).

[¶ 28] The Court must consider the facts known by Patnode and Sauerwein at the time of the search. Extensive depositions have been taken in these cases. Viewing the facts in the light most favorable to the plaintiffs, the court finds, based upon the present record, that on May 29, 1997, the second to the last day of school at Northwestern, Holly Morgan, then a Northwestern junior, first reported to her mother and later came to Sauerwein's office and reported that approximately $200 from cheerleading candy sales was missing from her unlocked locker in the girls' locker room. It later developed that the missing money was only $57.00 or $59.00. She testified it was stolen sometime between "first bell" and noon. Sauerwein lectured Holly about having failed to lock her locker and she stormed out of his office. Sauerwein apparently saw no need to do anything at that time. At approximately 12:30 P.M.,

Jeannie Morgan, the school's head cook and Holly's mother, told Sauerwein that her daughter, Holly, had money stolen from her gym locker (although Ms. Morgan would have had no personal knowledge as to what had transpired) and inquired what he intended to do about it. Sauerwein then decided he had the advantage of surprise and that the money either had to be in the lockers or on the girls (even though any adult or any student could also have had access to the unlocked locker room and the unlocked locker). He locked the girls' locker room and asked the girls to stay in the lunchroom as they finished eating. The eighth grade girls returning from gym class at the softball field were unable to enter the locker room and instead were told to sit in the lunch room. The boys were allowed to leave the lunchroom. After the girls present were assembled, Sauerwein began lecturing the girls. He was very agitated and loud and was pacing back and forth yelling at the girls. Sauerwein claims he told the girls they were always "bitching" to him about locking the locker room but were the first to complain when money is stolen. Although he denied actually calling the girls "bitches," several students claim he did refer to them by that term. He stated that he didn't care if it was legal or not, he was going to search the girls, including a strip search, and find the money. He told them that if they find the money, that "person's going out the front door with the sheriff in hand cuffs."

[¶ 29] Sauerwein first had the girls place the contents of their pockets on the tables so he could inspect them. He started at the first table. Genzler and Konop, who were at the second table, had picked lilacs on the way back from the softball field and Genzler placed her flowers on top of her money on the table. Konop also reached out to touch the lilacs on the table. Genzler was wearing a thermal shirt with a flannel shirt over it. She claims she was nervous, shaking, and twiddling her thumbs on the table. She was whispering to the girls at the table about the missing money. Diana Larson, the school's business manager, claims to have observed this conduct. Lisa Morgan, a cook and an aunt of the alleged victim of the theft, was standing by the lunchroom counter and claims that after Sauerwein told the girls to empty their pockets, she saw Genzler "reach into her pockets ... moving around, digging underneath her flannel plaid shirt, moving from pocket to pocket ... trying to get Amber's attention," and that Genzler tried to hide something under the lilacs. Jeannie Morgan, who also claims she observed Genzler trying to hide the money under the lilacs, grabbed the money on the table in front of Genzler and brought it to Sauerwein, saying "Here is your money. Here, she is the one who stole it," and "Lacy was just trying to pass it." Genzler had about $14 and Konop had about $10. Typically, students have more money than usual on the last days of school to pay school fines. Sauerwein asked Genzler where she had gotten the money and she explained that she babysat the evening before, that some girls paid money owed to her, and that she had been using the money to pay fines. Sauerwein counted the money, felt it was not significant, and concluded that it was not the stolen money. He moved on to the next table. Genzler began to cry. Sauerwein concluded it was a tense moment and that Genzler was not handling it very well. He did not conclude Genzler had stolen any money. He has testified he did not suspect Genzler when she was searched and thus prior thereto as well.

[¶ 30] Following the pocket search, all the girls, except Konop and Genzler, were allowed to collect their belongings from the table. At that time, Patnode, the band teacher, suggested checking shoes and bras. Sauerwein, having already announced his intentions to conduct a strip search, saw no problem with that and directed Ms. Larson, the school business manager, to take two girls at a time into the bathroom. He also directed Patnode and Ms. Young, the administrative assistant or school secretary, to take two girls at a time into the locker room to check shoes and bras. At that time, Sauerwein had no evidence that any of the girls had stolen the money; yet he intended to have all girls searched. In fact, he had not conducted any investigation to determine if the theft allegation could be supported by evidence or to determine who were possible suspects. Following the strip searches, the girls' locker room lockers, book lockers, and cars were searched.

[¶ 31] Ms. Larson suggested to Patnode that she search Genzler and Konop first. There is no evidence as to why Larson told her to do so. Patnode thought the two girls were to be searched first, partly because they were sitting at the end of the table and partly because Patnode claims Jeannie Morgan told Patnode she had seen Genzler put money in her bra. There is no evidence in the excerpts (as presented to the Court) from Lisa Morgan and Jeannie Morgan's depositions that they claimed to have seen Genzler put money in her bra or that they gave Patnode this information. Most of the relevant deposition testimony concerned Genzler fidgeting and allegedly trying to hide her money on the table under the lilacs. The factual dispute must be resolved in favor of the plaintiffs and, under the current record, the Court cannot conclude that at the time of the search Patnode or anyone else had any reason at all to believe either or both plaintiffs stole money.

[¶ 32] Patnode approached the plaintiffs' table and told them that "they want us to search you first." The girls were taken in together and told to strip like they were in physical education class. Ms. Young objected and told Patnode that she did not think that was necessary. Genzler did not want to remove her pants so she took them down to her knees. The plaintiffs were told to remove their underwear but refused to do so. They were then told to pull their bras away from their bodies so that Patnode could inspect them. Young objected because the girls were wearing sports bras and Young concluded that $200 (which was very likely to have been in many bills of small denominations) would be visible from the outside. Patnode pulled Genzler's underwear away from her body, both in front and in back, and pulled Konop's underwear away from her body in back. She actually touched Konop in doing this. Konop was menstruating at the time and the students were embarrassed and humiliated but did not think they had a right to say "no." Both students were crying during the search and Ms. Young continued to object during the search, saying they were looking for a large number of bills and surely they would be able to see it through the undergarments without removing them.

[¶ 33] No money was found on the plaintiffs. When the plaintiffs left the locker room, they were crying. Patnode did not require any other girls to remove all their clothing. Patnode claims she thought they would find the money on plaintiffs and had no reason to think the other girls would have the money. She realized that, if they had the money tucked into the panties, it would be visible without having to remove the panties or pull at the waist band.

[¶ 34] It is undisputed that school officials were not searching for weapons or drugs or anything else posing even a possible threat to students or others. There was no imminent serious harm of any kind. There is no evidence of any thought given to consulting legal counsel, summoning law enforcement officials, or summoning parents. Reliance on or seeking the advice of counsel is a factor to be weighed in assessing whether a public official is entitled to qualified immunity. *Tubbesing v. Arnold,* 742 F.2d 401, 407 (8th Cir.1984). As to the plaintiffs, the strip searches were made first, i.e. before any search of lockers or motor vehicles (which was done later). Any search of lockers or even vehicles would have been far less intrusive than a strip search. The facts in the present case are thus totally different from the factual situation in *T.L.O.* where the Supreme Court validated the escalating search only because, with each search, they continued to find additional evidence. *See* 469 U.S. at 347, 105 S.Ct. 733. The discovery of rolling papers of T.L.O. "justified further exploration of T.L.O.'s purse"; the evidence of drug dealing thus justified the expansion of the search to the separate zippered compartment which led to the discovery of the "list of people who owe me money" which justified reading letters found in the zippered compartment. There is no evidence in the present case of any prior instances of students at Northwestern having concealed money in their clothing. There is evidence of a history of other thefts at school, apparently without similar circumstances to those alleged by Holly Morgan. There is evidence favorable to plaintiffs to the effect that they were good students, active in extracurricular activities and that the school officials had absolutely nothing upon which to base the decision to

strip search. Arguable reasonable suspicion to strip search was missing and qualified immunity is therefore inappropriate. The search was clearly intrusive, given the sex and the ages of the plaintiffs. It may have been the intention in *T.L.O.* to refer to sex in the context of a comparison between the party searching and the party being searched. Unlike the facts in *T.L.O.*, teachers do not often go to the bathroom to assist girls the ages of Konop and Genzler. The search was also intrusive, given the nature of even the alleged infraction. Strip searches (although more intrusive than what occurred here) have been referred to as "demeaning, dehumanizing, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." See *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir.1983) (quoting from other cases). In *Mary Beth*, those being searched had been arrested for misdemeanors.

[¶ 35] Other language from *Mary Beth G.* furnished a clear and easily available statement of the law with regard to strip searches as long ago as 1983:

> The reasonableness standard usually requires, "at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test." *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) (footnotes omitted). The more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted. *Terry v. Ohio*, 392 U.S. 1, 18, n. 15, 88 S.Ct. 1868, 1878 n. 15, 20 L.Ed.2d 889 (1968). Based on these principles, we agree with the district court in *Jane Does* that ensuring the security needs of the City by strip searching plaintiffs-appellees was unreasonable without a reasonable suspicion by the authorities that either of the twin dangers of concealing weapons or contraband existed. *Doe v. Renfrow*, 631 F.2d 91, 93 (7th Cir.1980) (per curiam), cert. denied, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981) (strip search of a minor student without reasonable cause to believe she possessed contraband on her person violates "any known principle of human decency" and "exceed[s] the 'bounds of reason' by two and a half country miles"); *Tinetti v. Wittke*, 620 F.2d 160 (7th Cir. 1980) (per curiam) (strip searches of persons arrested and detained overnight for nonmisdemeanor traffic offenses without probable cause to believe that detainees are concealing contraband or weapons on their bodies are unconstitutional).

723 F.2d 1263 at 1273.

[¶ 36] The final question presented by the motion for summary judgment is whether there are material facts in dispute regarding the objective reasonableness of the defendants' conduct in light of the law and the facts known to the defendants at the time. "If there is a dispute over facts that might affect the outcome of the suit under the law of qualified immunity, there can be no summary judgment." *Creighton v. Anderson*, 922 F.2d 443, 447 (8th Cir.1990). There exists a factual dispute whether or not Sauerwein called the girls "bitches." This fact is not material to the qualified immunity analysis. There is also a factual dispute as to whether Sauerwein stated that he knew the strip searches were illegal but did not care and was going to proceed anyway. It is clear from *Harlow v. Fitzgerald* that subjective intent or motive of the defendant is irrelevant to the qualified immunity analysis. *Crawford–El v. Britton*, —— U.S. ——, ——, 118 S.Ct. 1584, 1592, 140 L.Ed.2d 759 (1998). Nonetheless, under *Harlow*, the test is whether a reasonable person would have known he or she was violating the plaintiffs' rights. Sauerwein knew, or should have known, that the strip searches as conducted here, under the circumstances, were illegal. He testified that, after the fact, he would have tried to stop the searches if he knew they would be going to the extent they did. This is some evidence of what a reasonable school official would have known. The factual dispute as to Sauerwein's knowledge is not material for the purpose of this motion because, even if Sauerwein did not know his conduct was illegal, he is not entitled to qualified immunity if he reasonably should have known.

[¶ 37] There is a factual dispute as to whether or not Jeannie Morgan saw the plaintiffs try to hide money in their clothes or pass money between them. This dispute is not material since what others knew about the facts is irrelevant to the objective reasonableness of Sauerwein and Patnode in conducting the searches.

[¶ 38] There are no facts in dispute regarding the objective reasonableness of Sauerwein and Patnode's conduct. At the time of the pocket searches, Sauerwein knew that $200 had allegedly been stolen by some person from the girls' locker room between first period and 12:30 p.m. At the time of the strip searches, Sauerwein knew no more. He had no personal knowledge that anything had actually been stolen as distinguished from being lost. In a normal investigation, the first person to come under suspicion is the custodian of the money, especially when a young girl claims to have left $200.00 of cheerleaders' money in an unlocked locker which she could easily have locked, especially after all student had been told previously to keep lockers locked. At the time of the strip searches, Patnode knew that $200 had allegedly been stolen and she claims she was told that the plaintiffs "were the ones that were suspicious ... because of the money being thought to have been seen put up underneath their bra" when they were told to empty their pockets. However, there is no evidence from Ms. Morgan that she ever saw Genzler do this and there is no evidence anyone saw or even claimed to have seen Konop do so. This factual dispute is not material because, as set forth below, even if Patnode suspected Genzler had put the $200 in her bra, the strip search as conducted was objectively unreasonable.

**D. Objective Reasonableness of Defendants' Conduct**

[¶ 39] The law was clearly established as of the time of the strip searches of plaintiffs that students could not be subjected to unreasonable searches. *New Jersey v. T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742. The defendants now have the burden of proof with respect to the objective reasonableness of their conduct in light of the law and facts. *Creighton v. Anderson,* 922 F.2d at 447. Sauerwein did not take part in the strip searches. Instead, he directed Patnode, Young and Larson to conduct the searches. "Consequently, it is more appropriate to analyze his conduct under a supervisory liability theory." *Cales v. Howell Public Schools,* 635 F.Supp. at 456. "Supervisory personnel are subject to liability where evidence establishes that they authorized [or] approved ... the unconstitutional conduct of the offending officers." *Id., citing Ghandi v. Police Dept. of the City of Detroit,* 747 F.2d 338, 351 (6th Cir.1984).

[¶ 40] Against the child's interest in privacy must be set the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds. *New Jersey v. T.L.O.,* 469 U.S. at 339, 105 S.Ct. at 741. It is a very difficult task today to maintain discipline. The United States Supreme Court explained in *T.L.O.:*

> We join the majority of courts that have examined this issue in concluding that the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: first, one must consider "whether the ... action was justified at its inception," *Terry v. Ohio,* 392 U.S. at 20, 88 S.Ct. 1868; second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place," *ibid.* Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope

when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*Id.* at 341–342, 105 S.Ct. at 742–743.

This standard will, we trust, neither unduly burden the efforts of school authorities to maintain order in their schools nor authorize unrestrained intrusions upon the privacy of school children. By focusing attention on the question of reasonableness, the standard will spare teachers and school administrators the necessity of schooling themselves in the niceties of probable cause and permit them to regulate their conduct according to the dictates of reason and common sense. At the same time, the reasonableness standard should ensure that the interests of students will be invaded no more than is necessary to achieve the legitimate end of preserving order in the schools.

*New Jersey v. T.L.O.*, 469 U.S. at 343, 105 S.Ct. at 743. *T.L.O.* involved the initial search of a student's purse for cigarettes. The United States Supreme Court upheld that search as reasonable.

▪ [¶ 41] The court determines that, on the record, the search as conducted was not justified at its inception. A search meets this requirement only "when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.*, 469 U.S. at 342, 105 S.Ct. at 743. There were no such reasonable grounds.

▪ [¶ 42] Further, the search as actually conducted was not "reasonably related in scope to the circumstances which justified the interference in the first place." *ibid.* *T.L.O.* teaches us that it is not unreasonable to search a purse *after a locker search* based upon the reasonable suspicion of a teacher that cigarettes could be found therein. Further, once contraband is found, it is not unreasonable to conduct an extended search of a zippered pouch within the purse. *T.L.O.*, 469 U.S. at 347, 105 S.Ct. at 745. However, in the present case, defendants, once they did not find money in the pockets, shoes or socks, did not have reasonable suspicion to search the bras and the failure to find money in the bras certainly did not justify extending the search to the underwear.

▪ [¶ 43] Defendants ask the Court to determine as a matter of law that the search was permissible in its scope, reasonably related to the objectives of the search, and not excessively intrusive in light of the age and sex of the students and the nature of the infraction. The Court declines to do so. The school officials possessed no specific information that any particular student had stolen the money. In fact, Sauerwein testified at his deposition that "anyone" could have gone into the unlocked locker room that morning. Further, Sauerwein did not consider the amount of money Genzler had as significant, given the amount alleged to be missing.

▪ [¶ 44] Alternatively, if the Court finds that the search was unreasonable, defendants ask the Court to find that a reasonable school official would not have known that a strip search under these circumstances was unreasonable. As the Seventh Circuit has held:

It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human decency. Apart from any constitutional readings and rulings, simple common sense would indicate that the conduct of the school officials in permitting such a nude search was not only unlawful but outrageous under "settled indisputable principles of law" (420 U.S. at 321, 95 S.Ct. at 1000). *Wood v. Strickland,* supra, accords immunity to school officials who act in good faith and within the bounds of reason. We suggest as strongly as possible that the conduct herein described exceeded the "bounds of reason" by two and a half country miles. It is not enough for us to declare that the little girl involved was indeed deprived of her constitutional and basic human rights. We must also permit her to seek damages from those who caused this humiliation and did indeed act as though students "shed at the schoolhouse door rights guaranteed by . . .

any ... constitutional provision" (475 F.Supp. at 1023).

*Doe v. Renfrow,* 631 F.2d 91, 92–93 (7th Cir.1980). In *Doe v. Renfrow,* school officials and the police conducted a search of all students at Highland High School and Highland Junior High in Highland, Indiana, by the use of a drug dog. If the dog alerted to a student, that student was strip searched. The District Court held that the dragnet searches were constitutional but that the strip searches were unconstitutional. The District Court held, however, that the defendants were entitled to qualified immunity from damages. 475 F.Supp. 1012. The Seventh Circuit affirmed with the exception of that portion of the decision holding that the defendant school officials were entitled to qualified immunity. The case was remanded for a determination of damages. A petition for rehearing was denied at 635 F.2d 582, as was a petition for a writ of certiorari, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395. Justice Brennan dissented, concluding that the Fourth Amendment does not authorize a "student-by-student dragnet inspection". *Doe v. Renfrow,* 451 U.S. at 1022, 101 S.Ct. at 3016. Although *Doe v. Renfrow* preceded the supreme Court's announcement of the "reasonableness" standard in *T.L.O.,* the Seventh Circuit did apply a reasonable cause standard in *Doe,* and that opinion is therefore instructive.

[¶ 45] Defendants contend that "A school principal cannot be charged with full and comprehensive knowledge of subtle aspects of constitutional law." Accepting this statement as true, it is clear from the depositions that Ms. Patnode did not think that strip searches generally were acceptable at school. The Northwestern School Superintendent has testified that the strip search was not justified. Jeannie Morgan has stated that she did not think the girls should have been strip searched. The case law is pervasive that a strip search, the objective of which is to recover money, is illegal absent some reasonable indication that a particular student stole the money. The Court concludes, for summary judgment purposes only, that given the facts in the light most favorable to the plaintiffs, school officials did not act reasonably when they conducted the strip search of plaintiffs without a reasonable basis to believe a particular student committed a crime. Any reasonable school official should have known that strip searching students without a reasonable basis to believe they committed a crime violates their rights. Based upon the record before the Court, Sauerwein did not have any reasonable cause to believe the plaintiffs stole the missing $200. In fact, Sauerwein did not even investigate whether, in fact, $200 was missing. He simply acted on the accusation of a student that $200 had been stolen. It was later discovered that $200 had not been stolen, but that less than $60 was missing.

[¶ 46] Patnode's only basis for believing the plaintiffs stole the $200 was that she was told that the plaintiffs fidgeted while they were emptying their pockets, that they tried to hide the money from their pockets under the lilacs they had picked, and that one was whispering. Even if the Court were to conclude that a limited search was reasonable under these circumstances, the Court cannot conclude that the strip search was reasonable. Ms. Young had tried to tell Patnode that $200 stuck in a bra or panties would surely be noticeable without having the bras and panties removed or pulled away from their bodies for visual inspection. Even Patnode acknowledged this and did not pull the undergarments away from the bodies of the students searched subsequent to the searches of plaintiffs. Patnode has not shown that she acted objectively reasonable under the circumstances.

### III. State Law Claims

[¶ 47] Defendants claim the state law claim for intentional infliction of emotional distress must be dismissed because there is an absence of evidence of extreme or outrageous conduct. To the contrary, there is sufficient evidence that defendants' conduct may have been extreme or outrageous. Further, there is a genuine issue of material fact whether plaintiffs suffered an extreme disabling emotional response to defendants' conduct.

[¶ 48] Defendants claim the battery claim must be dismissed because there is no evidence that Patnode acted with intent to touch Konop. To the contrary, Patnode ac-

knowledged pulling the waist band of Konop's panties away from her body. The jury should be allowed to decide whether that could have been accomplished without touching Konop.

## IV. Further Proceedings

Questions of immunity are decided by the Court, rather than the jury, as "the entitlement is an immunity from suit rather than a mere defense to liability." *McCleary v. Navarro*, 504 U.S. 966, 967, 112 S.Ct. 2324, 2324, 119 L.Ed.2d 243 (1992) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985)). This Court's holding that the defendants are not entitled to qualified immunity is made in the context of a summary judgment motion and does not foreclose further litigation of the plaintiffs' claims or the defendants' qualified immunity defense. *Peterson v. City of Plymouth*, 60 F.3d 469, 473 (8th Cir.1995). As the United States Supreme Court has observed:

"The denial of a defendant's motion for . . . summary judgment on the ground of qualified immunity . . . is 'conclusive' in either of two respects. In some cases, it may represent the trial court's conclusion that even if the facts are as asserted by the defendant, the defendant's actions violated clearly established law and are therefore not within the scope of the qualified immunity. In such a case, there will be nothing in the subsequent course of the proceedings in the district court that can alter the court's conclusion that the defendant is not immune. Alternatively, the trial judge may rule only that if the facts are as asserted by the plaintiff, the defendant is not immune. At trial, the plaintiff may not succeed in proving his version of the facts, and the defendant may thus escape liability. Even so, the court's denial of summary judgment finally and conclusively determines the defendant's claim of right not to stand trial on the plaintiff's allegations . . . ."

*Mitchell v. Forsyth*, 472 U.S. 511, 527, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). In this case, the Court has ruled only that if the facts are as asserted by the plaintiff, the defendants are not entitled to qualified immunity. The law of the case doctrine is not strictly applicable and the defendants will be allowed to offer evidence at trial disputing the version of the events upon which this holding is based. *Peterson v. City of Plymouth*, 60 F.3d at 473. Upon trial of this matter, although "it is the province of the jury to determine disputed predicate facts, the question of qualified immunity is one of law for the court." *Peterson v. City of Plymouth*, 60 F.3d at 474, n. 6. The jury is therefore entitled to determine what facts were known to Sauerwein and Patnode at the time of the searches. The legal conclusion as to qualified immunity is for the Court to make. *Id.* at 475.

### ORDER

[¶ 49] Now, therefore,

[¶ 50] IT IS ORDERED that the motion for summary judgment, Doc. 13, should be and is denied.

[¶ 51] Dated this 9th day of November, 1998.